# Exhibit 1

```
 1          IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF KANSAS
 2

 3

 4

 5   MATHEW R. WURM,

 6
              Plaintiff,
 7
                                  Civil Case No.
 8     vs.                        2:18-CV-2322

 9
     FORD MOTOR COMPANY, a
10   Delaware corporation,

11
              Defendant.
12

13

14

15    VIDEOTAPED DEPOSITION OF BRITTANY MAE KERLEY

16

17

18        TAKEN ON BEHALF OF THE DEFENDANT

19

20                  July 15, 2019

21

22

23

24

25
```

Exhibit 1- 1

KERLEY , BRITTANY MAE
07/15/2019                                                                      Page 4

```
 1                    A P P E A R A N C E S

 2
          For the Plaintiff:
 3
                    Mr. Eric Kjorlie
 4                  Kjorlie Law Firm
                    Historic Tinkham Veale Place
 5                  827 SW Topeka Boulevard
                    Topeka, KS  66612-1608
 6                  (785) 232-6868
                    (785) 232-6878 (Fax)
 7                  kjorlielaw@sbcglobal.net

 8
          For the Defendant:
 9
                    Mr. Steven E. Ward
10                  McAfee & Taft
                    4050 South Fairview Avenue
11                  Springfield, Missouri  65807
                    (417) 409-6000; Direct (417) 409-6090
12                  (417) 409-6055 (Fax)
                    steve.ward@mcafeetaft.com
13

14    Videographer:  Michael Dennis

15    Also present:    Matthew Wurm

16

17

18

19

20

21

22

23

24

25
```

Exhibit 1- 2

```
 1   bit long, but there's lots of facts that I'm trying

 2   to get into them.

 3           A.    Sorry.

 4           Q.    That's all right.

 5                 So both William and Nathan -- I'm

 6   sorry, William and Matthew and you were in the rear

 7   seat of the truck, right?

 8           A.    Yes.

 9           Q.    And Nathan was driving.  Trenton was in

10   the front passenger seat?

11           A.    Yes.

12           Q.    Who was wearing their seat belt?

13           A.    Trent.  I believe he was the only one.

14           Q.    Okay.  Did you actually see him wearing

15   a seat belt or is that something that you've

16   learned since the fact, since the accident?

17           A.    Well, I know Trent and I know that he

18   always wears his seat belt.  And then after the

19   wreck, I learned that he was -- I just assumed that

20   he was.

21           Q.    Okay.  And then -- but none of the

22   three occupants, including yourself, in the

23   backseat, were wearing your seat belts, correct?

24           A.    Correct.

25           Q.    All right.  So you now crossed the
```

MIdeps@uslegalsupport.com                    U. S. LEGAL SUPPORT                    Phone:  888.644.8080
Ann Arbor | Detroit | Flint | Jackson        Bingham Farms/Southfield | Grand Rapids        Lansing | Mt. Clemens | Saginaw | Troy

Exhibit 1- 3

```
 1          A.   Not here recently, no.

 2          Q.   Okay.  And do you know why that

 3    relationship has discontinued?

 4          A.   They were already kind of like

 5    rockyish.  Some of Trent's decisions or actions

 6    made Matthew feel uncomfortable, so it's kind of a

 7    weird friendship for them.

 8          Q.   And what -- if you know, what actions

 9    or decisions, as you called them, were what caused

10    Matthew to be uncomfortable?

11          A.   Trent had a huge crush on me and tried

12    to pursue me, so that kind of made Matthew a little

13    uncomfortable.  When we weren't together, Trent was

14    trying.

15          Q.   Okay.  All right.

16               MR. WARD:  If you have questions, I'll

17    pass the witness.  If you don't, give me a moment

18    and I'm going to run through my notes and see if I

19    have any more.

20               MR. KJORLIE:  Well, I have a couple.

21               MR. WARD:  Okay.  Feel free to go

22    ahead.

23                         EXAMINATION

24    BY MR. KJORLIE:

25          Q.   What is your relationship with the
```

Exhibit 1- 4

```
 1    Mitchells that live in Overbrook?

 2         A.    Not a good one, but I knew that they're

 3    on the fire department and their son was in my

 4    graduating class.

 5         Q.    And do you have a criminal record?

 6         A.    Not on record, no.

 7         Q.    Did you have a criminal complaint filed

 8    against you by the Mitchells?

 9         A.    Yes.

10         Q.    And can you describe what happened in

11    that regard?

12         A.    It was -- their son, Cody Mitchell, we

13    had a -- he had came -- do I just like tell the

14    story like what happened?

15         Q.    Sure.

16         A.    Okay.  He had came to my house because

17    he was working with my father and he was being --

18    he was talking trash on my family and my sister and

19    to Trent, about Trent to my dad and my mom.  And I

20    asked him to leave.  He wouldn't leave the

21    property.  So I proceeded to remove him from my

22    property.  And he ended up calling the cops on me.

23    And it was a little ridiculous, but...

24         Q.    He filed a criminal complaint?

25         A.    Yeah.
```

MIdeps@uslegalsupport.com                    **U. S. LEGAL SUPPORT**                    Phone:  888.644.8080
Ann Arbor | Detroit | Flint | Jackson        Bingham Farms/Southfield | Grand Rapids        Lansing | Mt. Clemens | Saginaw | Troy

Exhibit 1- 5

```
 1           Q.    What was the eventual result of that?

 2           A.    I think after everything was all done,

 3      he wanted to press like a battery charge or

 4      something like that, but it ended up not being

 5      that.

 6           Q.    Okay.   In reference to the sports that

 7      were matters that Matthew participated in in high

 8      school, what kind of sports did he participate in?

 9           A.    Before the wreck?

10           Q.    Yes.

11           A.    He was playing baseball.   He was

12      wrestling.   He played football.   I know outside of

13      school he had a slow pitch team.   And occasionally

14      him and his father went golfing.   He was pretty

15      much doing anything he could.

16           Q.    He was very athletic?

17           A.    Yes.

18           Q.    After the accident, did he try out for

19      sports that you're aware of?

20           A.    He tried.

21           Q.    Was there an incident about the mascot

22      for the high school?   What's that story about?

23           A.    He couldn't wrestle, so he still -- and

24      he couldn't play football, so it was his senior

25      year, he wanted to be a part of the team still, so
```

MIdeps@uslegalsupport.com                    U. S. LEGAL SUPPORT                    Phone: 888.644.8080
Ann Arbor | Detroit | Flint | Jackson      Bingham Farms/Southfield | Grand Rapids      Lansing | Mt. Clemens | Saginaw | Troy

Exhibit 1- 6

```
 1   he tried out to be the mascot.  And I think it was

 2   maybe two or three games and we have this thing at

 3   our school where you do the push-ups for how many

 4   points you score.  And Matthew couldn't do that, so

 5   he couldn't --

 6        Q.   He couldn't be the mascot?

 7        A.   He couldn't be the mascot.

 8        Q.   Okay.

 9             MR. KJORLIE:  I don't have any further

10   questions.

11                     EXAMINATION

12   BY MR. WARD:

13        Q.   The playing baseball and being on the

14   sports teams at -- was this at his high school that

15   he did it before the accident?

16             MR. KJORLIE:  Let's go off.

17             MR. WARD:  Yeah.  Let's go off the

18   record for a second.

19             VIDEOGRAPHER:  We're now going off the

20   record.  The time is 4:41.

21             (Off-the-record discussion.)

22             VIDEOGRAPHER:  We're now going back on

23   the record.  The time is 4:43.

24   BY MR. WARD:

25        Q.   Before we had a little incident with
```

Exhibit 1- 7

Exhibit 2



December 4, 2019


McAfee & Taft
4050 S. Fairview Avenue
Springfield, MO 65807

RE:  Mathew R. Wurm vs Ford Motor Company
     Deposition of Brittany Wells Kerley taken on July 15, 2049

Dear Mr. Ward:

Enclosed is the signed Verification of Deponent page from the above-referenced transcript along
with the errata sheet.  Please feel free to contact my office if you have any questions.

Sincerely,

Sarah Stauffer
Production Department

Enclosure

cc:

BRITTANY MAE KERLEY DEPOSITION ERRATA SHEET INSERT @Page 86

RE: Wurm vs. Ford Motor Company- Kerley Deposition taken 07/15/2019

## KERLEY DEPOSITION CORRECTIONS

Brittany Mae Kerley Deposition Corrections 12/2/2019

**PAGE: LINE**

| | Correction | Reason for Correction |
|---|---|---|
| 21 /24 | Delete the word "Correct" and change my answer to: " I just assumed that the other two occupants in the back seat, Mathew Wurm and William Pagan were not wearing their seatbelts; but I have no independent knowledge to state that either they were, or that they were not, wearing their seatbelts. | To accurately reflect fact |

I have read my Deposition Corrections consisting of this one (1) page signed below, and also, I have signed and dated my Deposition Errata Sheet on page 87 of my Deposition.

DATED: 12-2-19

BRITTANY MAE KERLEY

Exhibit 2- 2

Exhibit 3

PARCELLS, SHAWN LYNN
08/01/2019                                                          Page 1

```
 1    .

 2               IN THE UNITED STATES DISTRICT COURT

 3                    FOR THE DISTRICT OF KANSAS

 4                          AT KANSAS CITY

 5    .

 6    .

 7   MATHEW R. WURM,

 8            Plaintiff,

 9      vs.                       Case No. 2:18-CV-2322

10   FORD MOTOR COMPANY,

11   a Delaware Corporation,

12            Defendant.

13    .

14    .

15                    VIDEOTAPED DEPOSITION OF

16                    SHAWN LYNN PARCELLS,

17   taken on behalf of the Defendant, pursuant to

18   Notice of Deposition, beginning at 10:45 a.m. on

19   the 1st day of August, 2019, at the Kjorlie Law

20   Office, 827 Southwest Topeka Boulevard, in the

21   City of Topeka, County of Shawnee, and State of

22   Kansas, before Barbara J. Hoskinson, Certified

23   Court Reporter, Kansas License No. 0434 and

24   Missouri License No. 999.

25    .
```

Exhibit 3- 1

PARCELLS, SHAWN LYNN
08/01/2019                                                                Page 2

```
 1                         APPEARANCES

 2    .

 3    .

 4   ON BEHALF OF THE PLAINTIFF:

 5    .

 6        Mr. Eric Kjorlie

 7        Kjorlie Law Office

 8        827 SW Topeka Boulevard

 9        Topeka, Kansas  66612

10        785-232-6868

11        kjorlielaw@sbcglobal.net

12    .

13    .

14   ON BEHALF OF THE DEFENDANT:

15    .

16        Mr. Steven E. Ward

17        McAfee & Taft

18        2 West Second St., Suite 1100

19        Tulsa, Oklahoma  74103

20        918-587-0000

21        steve.ward@mcafeetaft.com

22    .

23    .

24   ALSO PRESENT:

25        Mr. Efrain Soto, Videographer
```

MIdeps@uslegalsupport.com                    U. S. LEGAL SUPPORT                    Phone:  888.644.8080
Ann Arbor | Detroit | Flint | Jackson     Bingham Farms/Southfield | Grand Rapids     Lansing | Mt. Clemens | Saginaw | Troy

Exhibit 3- 2

```
 1    see any cervical fractures because the force is

 2    transferred as it continues down and that's why

 3    you see the, more of the fractures along from the

 4    thoracic to the lumbar.  My opinion is, is that

 5    the fractures occurred -- you know, it's possible

 6    they could have occurred simultaneously.

 7         Q.   Okay.

 8         A.   But it's also possible that some of them

 9    occurred ones before the other but that --

10         Q.   And my question to you is can you tell

11    me, if you know, based upon the injuries which

12    ones occurred first and which ones occurred second

13    and, you know, what the order was, can you tell me

14    that?

15         A.   It's probable that the ones up here are

16    going to occur before the ones down here.

17    (Indicating).

18         Q.   And when you say up here you're talking

19    about the thoracic?

20         A.   Thoracic before the lumbar.

21         Q.   All right.  Now, when Mr. Wurm -- well,

22    you can be seated.

23         A.   Okay.

24         Q.   My question to you now is what is your

25    understanding or your opinion as to the
```

MIdeps@uslegalsupport.com                    U. S. LEGAL SUPPORT                    Phone:  888.644.8080
Ann Arbor | Detroit | Flint | Jackson      Bingham Farms/Southfield | Grand Rapids      Lansing | Mt. Clemens | Saginaw | Troy

Exhibit 3- 3

```
 1    interaction of Mr. -- of the roof of the vehicle

 2    and Mr. Wurm's head or shoulders?

 3         A.    Where he's positioned in conjunction with

 4    the roof.

 5         Q.    How is it that contact is made?

 6         A.    Oh, okay.  It's, it's pretty much a

 7    direct axial load.  Angular motions, twisting, in

 8    other words, is going to create more of spiral

 9    fractures in the vertebrae than axial just pushing

10    straight down and he had quite a bit of axial

11    forces to fracture, as a young man, to fracture

12    those many vertebrae in his spinal column; so,

13    it's highly probable that his head and the roof

14    came in contact with each other and that force

15    went through the spine and then caused the

16    fractures.

17         Q.    Okay, so, when -- is it your opinion that

18    Mr. Wurm was being pulled down into his seat at

19    the time the roof crushed and came down and struck

20    him on the top of the head?

21         A.    Yes, and I meant to -- I meant to say

22    that when you look at the CT and MRI, he lost --

23    see, we all have curves.  So, our neck is actually

24    supposed to be curved this way and then the

25    thoracic and then the lumbar goes the other way,
```

Exhibit 3- 4

```
 1   want to initial that and date it today, might be

 2   good.

 3              THE VIDEOGRAPHER:  Can I have you put on

 4   your microphone.

 5              MR. KJORLIE:  There was a exhibit that

 6   was marked 12, I think, that was the textbook.

 7              MR. WARD:  Are you looking for it?

 8              MR. KJORLIE:  Yeah.  There it is, Spine

 9   Trauma.

10              THE WITNESS:  I'll work on that risk

11   ratio where I came up with that and then give it

12   to Eric.

13       CROSS-EXAMINATION

14       BY MR. KJORLIE:

15       Q.   I'll forget to do this, but if I don't,

16   Mr. Parcells, the comparative risk ratio that you

17   used in your report, is that a technique that is

18   used in epidemiology to determine causal

19   connections between forces applied to the body and

20   injury?

21              MR. WARD:  Object to the form.

22       A.    Yeah, it -- causation looks at -- or I'm

23   sorry, the risk ratio analysis would look at the

24   probable causations of some sort of an injury or

25   disease.
```

MIdeps@uslegalsupport.com            U. S. LEGAL SUPPORT            Phone:  888.644.8080
Ann Arbor | Detroit | Flint | Jackson    Bingham Farms/Southfield | Grand Rapids    Lansing | Mt. Clemens | Saginaw | Troy

Exhibit 3- 5

```
 1        BY MR. KJORLIE:

 2        Q.   Okay, and based upon certain -- is that

 3   kind of like a, what do you call those things,

 4   algebraic formula, or is that a --

 5             MR. WARD:  Object to form.  Go ahead.

 6        A.   It's a fraction.  You got a numerator,

 7   whatever your numerator is versus your

 8   denominator.

 9        Q.   Okay, and could you go back after, after

10   we're done and review your notes and records to

11   come up and provide that assessment as to how you

12   came to that conclusion in your report?

13        A.   Yes, I can.

14             MR. WARD:  Well, I'll object to the

15   extent he's got any notes or records.  He's told

16   me already he's got all his file here and it's not

17   here.

18        BY MR. KJORLIE:

19        Q.   How would you determine that?  From the

20   file, your file?

21        A.   Going back through some of the stuff

22   that, and redeveloping my risk ratio that I used,

23   yes.

24        Q.   Okay.  Now, as -- in science there are a

25   lot of factors that you must consider?
```

Exhibit 3- 6

PARCELLS, SHAWN LYNN
08/01/2019                                                                                    Page 225

```
 1        A.    Yes.

 2        Q.    Including new information that could

 3   become available?

 4        A.    Yes.

 5        Q.    And you have -- your opinions are not set

 6   in stone and you have -- if you have other

 7   information that may come available you will be

 8   able to provide that in your report, correct?

 9        A.    Yes.

10        Q.    One of the things that we discussed was

11   the Spine Trauma.  This is a -- is this a

12   recognized authority from the American Academy of

13   Orthopedic Surgeons?

14        A.    Yes.

15        Q.    And this is something that all people

16   that would be dealing with spine injury would be

17   able to use as a resource?

18        A.    Yes.

19              MR. WARD:  Object to form, lack of

20   foundation.

21        BY MR. KJORLIE:

22        Q.    And is this a resource that is readily

23   accepted in your profession as a anatomist?

24        A.    Yes.

25        Q.    We did not include the first part of the
```

MIdeps@uslegalsupport.com                  U. S. LEGAL SUPPORT                  Phone: 888.644.8080
Ann Arbor | Detroit | Flint | Jackson      Bingham Farms/Southfield | Grand Rapids      Lansing | Mt. Clemens | Saginaw | Troy

Exhibit 3- 7

```
 1    chapter, but on page 499 is compression fractures

 2    primarily a result of blunt force injuries?

 3            MR. WARD:  Object to the form.

 4    Incomplete hypothetical, calls for speculation,

 5    assumes facts not in evidence.

 6        A.   Yes, I mean it --

 7    BY MR. KJORLIE:

 8        Q.   Referring to introduction, it

 9    discusses --

10        A.   Yeah, I just wanted to read it real

11    quick, but I would agree with the textbook that it

12    discusses the fact that compression fractures

13    involves either a combination of forward

14    flexion-distraction injuries and/or axial

15    compressive loading.

16        Q.   And is that -- and then they state that

17    that's primarily a result of blunt force injuries?

18            MR. WARD:  Object to the form.

19        A.   Yes.

20    BY MR. KJORLIE:

21        Q.   Okay, and that's in the text?

22        A.   Yes.

23        Q.   And it's your understanding in this case

24    that the plaintiff encountered a blunt force

25    trauma to his body?
```

MIdeps@uslegalsupport.com              U. S. LEGAL SUPPORT               Phone:  888.644.8080
Ann Arbor | Detroit | Flint | Jackson    Bingham Farms/Southfield | Grand Rapids    Lansing | Mt. Clemens | Saginaw | Troy

Exhibit 3- 8

PARCELLS, SHAWN LYNN
08/01/2019                                                                Page 227

```
 1              MR. WARD:  Object to the form.

 2       A.   Yes.

 3              (THEREUPON, Parcells Deposition Exhibit

 4   No 17 was marked for identification.)

 5       BY MR. KJORLIE:

 6       Q.   Parcells Exhibit No. 17 is the diagram

 7   that you provided in terms of how the human body,

 8   the spine, handles loads?

 9       A.   Correct.

10       Q.   And is this appropriate for axial loads?

11       A.   Yes.

12       Q.   And this is something that you -- this is

13   a scientific principle that is utilized in your

14   profession?

15              MR. WARD:  Object to the form.

16       A.   Yes, it's, it's basic spinal

17   biomechanics.

18       BY MR. KJORLIE:

19       Q.   Okay.  Now, I don't want to get too far

20   afield yet, but in -- handing you -- let's mark

21   this as the next exhibit.

22              (THEREUPON, Parcells Deposition Exhibit

23   No 18 was marked for identification.)

24       BY MR. KJORLIE:

25       Q.   Handing you what's been marked Parcells
```

MIdeps@uslegalsupport.com              U. S. LEGAL SUPPORT              Phone:  888.644.8080
Ann Arbor | Detroit | Flint | Jackson      Bingham Farms/Southfield | Grand Rapids      Lansing | Mt. Clemens | Saginaw | Troy

Exhibit 3- 9

```
 1   Exhibit No. 18.  Can you identify that document?

 2        A.   Oh, this is an Email I sent to you.

 3        Q.   And what is the significance of the, the

 4   Email from you?

 5        A.   Well, I was just trying to show that

 6   people have a misconception of what a clinical

 7   human anatomist does and, so, I wanted to further

 8   try to show you what we do is that clinical

 9   anatomy, we put the clinical side of medicine

10   together with anatomical principles where the two

11   come together.  So, a good example would be

12   someone is getting ready to have -- well, I'll

13   tell you about a article I just reviewed in my

14   clinical anatomy journal.  It talked about

15   dyspareunia, which is basically when the female

16   has painful intercourse and it talked about the

17   anatomy, it talked about the pathophysiology and

18   the etiologies, the treatment and the outcomes.

19   Clinical anatomists, we need to have an

20   understanding of that because we may end up

21   teaching those principles to health professionals

22   and we're not just lecturing on here's the

23   anatomy, we need to apply that with critical

24   thinking.  So, for example, in this Email, this is

25   a document done by Brent Hill.  I got this from my
```

MIdeps@uslegalsupport.com                    U. S. LEGAL SUPPORT                    Phone:  888.644.8080
Ann Arbor | Detroit | Flint | Jackson        Bingham Farms/Southfield | Grand Rapids        Lansing | Mt. Clemens | Saginaw | Troy

Exhibit 3- 10

PARCELLS, SHAWN LYNN
08/01/2019                                                    Page 229

```
 1    American Association of Physiologists and it's

 2    something that we can teach our students, a

 3    typical cold.  It goes through a scenario, a

 4    patient history, a physical exam, what happens

 5    during a physical exam, what you look for,

 6    objectives that -- these are things that basically

 7    we would be asking our students to think about.

 8    So, in other words, we produce critical thinkers

 9    so when they leave our courses they don't just

10    have an understanding of anatomy and physiology;

11    they have an understanding how that connects to

12    medicine.

13         Q.   Is this a common technique that is used

14    in the field of clinical anatomy?

15         A.   Yes.

16         Q.   Did you use this technique when you

17    prepared the report in this case?

18              MR. WARD:  Object to the form.

19         A.   Yes, I did.

20         BY MR. KJORLIE:

21         Q.   And it talks about the different types of

22    reviews that you would have to do to come up with

23    conclusions, correct?

24         A.   Correct.

25         Q.   These conclusions are based upon
```

```
 1   reasonable clinical anatomy opinion?

 2        A.   Yes.

 3        Q.   Now, in here also it talks about

 4   organizations that you're involved in.  The

 5   American Association of Anatomists?

 6        A.   Uh-huh.

 7        Q.   What's that?

 8        A.   It's the association that has anatomists

 9   as members.  We discuss -- most of them are people

10   that teach gross dissection at medical schools and

11   we have different conferences and talk about

12   education and how to make our profession better.

13        Q.   The Physiology Society, Human Anatomy and

14   Physiology Society, what's that group?

15        A.   It's a group of us that are made up that

16   our primary objective is teaching the subject to

17   undergrad or graduate students.

18        Q.   Okay, and the American Physiological

19   Society, did I say that --

20        A.   Yeah, that's a group of people who focus

21   on physiology principles.  A lot of them do

22   research.  A lot of them are very focused, they do

23   just neurophysiology and that's all they focus on,

24   but I am in the education section, so, I

25   predominantly focus on the education and teaching
```

MIdeps@uslegalsupport.com                  U. S. LEGAL SUPPORT                  Phone:  888.644.8080
Ann Arbor | Detroit | Flint | Jackson      Bingham Farms/Southfield | Grand Rapids      Lansing | Mt. Clemens | Saginaw | Troy

Exhibit 3- 12

PARCELLS, SHAWN LYNN
08/01/2019                                                        Page 231

```
 1    of this, of physiology to students at the

 2    undergraduate and graduate level.

 3         Q.   The materials that's used in preparing

 4    your report and the studies, were they

 5    peer-reviewed?

 6         A.   Yeah.

 7         Q.   And were those peer reviews, would that

 8    be information that you could utilize in your

 9    particular specialty of clinical anatomy?

10              MR. WARD:   Object to the form.

11         A.   Yes.

12         BY MR. KJORLIE:

13         Q.   Now, I'm going to go back a ways.

14         A.   Okay.

15              (THEREUPON, Parcells Deposition Exhibit

16    No 19 was marked for identification.)

17         BY MR. KJORLIE:

18         Q.   Sir, I'm handing you what's been marked

19    Parcells Exhibit 19.  Can you identify that

20    document?

21         A.   It was an article that was done about me

22    in the Kansas State Collegian when I was in my

23    undergraduate.

24         Q.   And what is the, the nature of the

25    article?  What does that concern?
```

MIdeps@uslegalsupport.com                    U. S. LEGAL SUPPORT                    Phone:  888.644.8080
Ann Arbor | Detroit | Flint | Jackson      Bingham Farms/Southfield | Grand Rapids      Lansing | Mt. Clemens | Saginaw | Troy

Exhibit 3- 13

```
 1        A.    Basically it was about me and the

 2    wonderful opportunities I had as an undergraduate

 3    student working in and around other physicians in

 4    pathology and neurosurgery at K.U.  Med Center.

 5        Q.    And also Jackson County Medical

 6    Examiner's office?

 7        A.    Yeah, Jackson County.  I think it even

 8    talks about when I went to Los Angeles County

 9    Coroner's office as well.

10        Q.    Okay.  Now, you were scrubbed down.  Were

11    you involved in providing procedures that were

12    necessary during autopsy?

13        A.    Yeah.  I -- during autopsy work I did

14    participate heavily in that doing dissection,

15    taking organs out, working with the pathologist,

16    taking photos, that sort of thing.

17        Q.    Who is Doctor Paul Monier?

18        A.    He was a pathologist I worked with at

19    K.U. Med.

20        Q.    And he indicates that the experience

21    you're gaining by observing and assisting on

22    autopsies is invaluable.  He knows more and has

23    the abilities to do more than many physicians in

24    those procedures.

25        A.    Yes.
```

MIdeps@uslegalsupport.com                U. S. LEGAL SUPPORT                Phone:  888.644.8080
Ann Arbor | Detroit | Flint | Jackson    Bingham Farms/Southfield | Grand Rapids    Lansing | Mt. Clemens | Saginaw | Troy

Exhibit 3- 14

PARCELLS, SHAWN LYNN
08/01/2019                                                          Page 233

```
 1        Q.    That was in the article?

 2              MR. WARD:  Object to form.

 3        A.    Yes, it was.

 4    BY MR. KJORLIE:

 5        Q.    How old were you at that time?

 6        A.    Let's see, when was this written?

 7        Q.    1999.

 8        A.    I would have been 19 or 20.

 9        Q.    Okay, what other areas in pathology have

10    you received training?

11        A.    I -- when I was at K.U. I did training in

12    surgical pathology.  Surgical pathology is

13    basically where, you know, something's removed

14    during a surgical procedure, it's sent down to

15    pathology, it's, it's evaluated, you describe it,

16    you dictate it, you section it and then

17    microscopic slides are produced of that tissue a

18    couple days later and then the pathologist makes

19    the diagnosis.

20        Q.    What other experience in the field of

21    pathology have you had in terms of hands-on

22    training?

23        A.    I did a, I did a stint at the Mayo Clinic

24    in a program called The interim Program, Student

25    Interim Program.  I worked with Doctor Williams,
```

Exhibit 3- 15

```
 1    Edward Williams who was known all over the country

 2    for cardiovascular pathology.  He's also director

 3    of the autopsy service at Mayo Clinic, so, I was

 4    there.  I participated in and did autopsies with

 5    the residents and staff.  I did cardiovascular

 6    pathology and neuropathology.

 7         Q.   Now, there is a Doctor Mathias Okoye,

 8    O-K-O-Y-E.  Who is he?

 9         A.   He's the forensic pathologist I worked

10    with off and on that is in Nebraska.

11         Q.   And how many gross autopsies have you

12    done to the present time?

13         A.   Over 2,500.

14         Q.   And in those -- you did that as a

15    pathology assistant?

16         A.   The vast majority, yes.

17         Q.   As a pathology assistant there is -- that

18    is a independent profession, is it not?

19         A.   Yes, it is.

20         Q.   Describe just briefly, what is it?

21         A.   It's similar to a physician assistant,

22    but working with a pathologist.

23         Q.   Okay.  You don't do independent pathology

24    as a pathology assistant?

25         A.   No.
```

MIdeps@uslegalsupport.com                    U. S. LEGAL SUPPORT                    Phone:  888.644.8080
Ann Arbor | Detroit | Flint | Jackson       Bingham Farms/Southfield | Grand Rapids       Lansing | Mt. Clemens | Saginaw | Troy

Exhibit 3- 16

```
 1        Q.    You require supervision of a pathologist?

 2        A.    Yes.

 3        Q.    Currently you are having some

 4   difficulties with the attorney general's office of

 5   Kansas because you're not providing the

 6   supervision in the manner in which the State Board

 7   of Healing Arts requires it under their specific

 8   statute, correct?

 9            MR. WARD:  Object to the form, leading.

10        A.    That's what I've been told, yes.

11   BY MR. KJORLIE:

12        Q.    Okay, and based upon that you're willing

13   in the criminal case to enter a plea of, or a no

14   contest plea to a criminal desecration of body to

15   one of the counts, correct?

16        A.    A misdemeanor.

17            MR. WARD:   Objection, leading.

18   BY MR. KJORLIE:

19        Q.    And the basis of that is that you did not

20   have the referral and direct supervision from a

21   pathologist during the time that you completed

22   your work for the Wabaunsee County coroner,

23   correct?

24            MR. WARD:   Object to form.

25        A.    Yes.  On that case with that misdemeanor
```

MIdeps@uslegalsupport.com                    U. S. LEGAL SUPPORT                      Phone:  888.644.8080
Ann Arbor | Detroit | Flint | Jackson    Bingham Farms/Southfield | Grand Rapids    Lansing | Mt. Clemens | Saginaw | Troy

Exhibit 3- 17

PARCELLS, SHAWN LYNN
08/01/2019                                                            Page 236

 1   charge, correct.

 2        BY MR. KJORLIE:

 3        Q.   Right, and in fact, because of the

 4   statute of the Kansas Board of Healing Arts you're

 5   willing to enter into a consent order with the,

 6   the board that you will not perform any autopsy

 7   services, including services as a autopsy

 8   assistant?

 9        A.   Correct.

10        Q.   Even though you're more than capable of

11   doing so?

12             MR. WARD:  Object to the form.

13        BY MR. KJORLIE:

14        Q.   Correct?

15        A.   Yes.  In the state of Kansas I will not

16   be providing those services anymore.

17        Q.   In all of the studies you've done in the

18   area of providing reports as a pathology assistant

19   with a sign-off from a pathologist have you ever

20   been, your work has been rejected?

21             MR. WARD:  Object to the form.

22        A.   No.  That's the odd thing.  In all of

23   these proceedings, even when I've been testifying

24   as an expert, no one has ever come up and shown

25   that my reports are erroneous and nonscientific.

MIdeps@uslegalsupport.com                    U. S. LEGAL SUPPORT                    Phone: 888.644.8080
Ann Arbor | Detroit | Flint | Jackson    Bingham Farms/Southfield | Grand Rapids    Lansing | Mt. Clemens | Saginaw | Troy

Exhibit 3- 18

```
 1    It's always been on other irrelevant matters.

 2         BY MR. KJORLIE:

 3         Q.   Okay.  Now, we did have a little tiff

 4    with the Kansas courts in the Locke case, correct?

 5         A.   Yes.

 6              MR. WARD:  Sorry, in what case?

 7              THE WITNESS:  The Locke case.

 8              MR. KJORLIE:  Locke.

 9              THE WITNESS:  Nyla Locke.

10         BY MR. KJORLIE:

11         Q.   Nyla Locke, it's a reported case.  And in

12    that case, number one, you were accused of

13    practicing law -- practicing medicine without a

14    license which you didn't have the ability to --

15         A.   Oh, you mean what the judge said over

16    here?

17         Q.   Right.

18         A.   Yeah, she said that.

19         Q.   And also the fact that because you

20    weren't proficient in the Intoxilyzer 8,000 that

21    you could not render an opinion as to whether or

22    not the asthma condition resulted in a false

23    reading under that case, right?

24              MR. WARD:  Object to the form.

25         A.   Yeah.  Basically the appellate court in
```

MIdeps@uslegalsupport.com                    U. S. LEGAL SUPPORT                    Phone:  888.644.8080
Ann Arbor | Detroit | Flint | Jackson        Bingham Farms/Southfield | Grand Rapids        Lansing | Mt. Clemens | Saginaw | Troy

Exhibit 3- 19

```
 1    summary, they basically said that it was not a

 2    matter of if I'm an expert or not an expert.  They

 3    agreed that I'm an expert.  Their concern was, was

 4    I an expert that can provide opinions specifically

 5    to that case.  Now, while I feel that I could

 6    because I have been involved with pulmonary

 7    physiology, they felt that I was in fact an expert

 8    in pathology and probably could provide opinions

 9    on the lung for pathological conditions, but they

10    felt like that I could not provide it on her basis

11    of her lung function not working.

12         BY MR. KJORLIE:

13         Q.   And one of those was a pulmonary function

14    test.  Did you provide that test?

15         A.   I did.  I provided, and it was not a test

16    to diagnose anything.  She had already been

17    diagnosed with COPD.  I performed a standard

18    physiology test that I do with my students when we

19    do the lung function lab and all I did was I took

20    a little machine that measures how much she can

21    blow out of her lungs in one second and her test

22    function was consistent with having COPD, because

23    I didn't want to say a hearsay that, hey, the

24    doctor said she's got COPD, she must have COPD.

25    Doctor said she has COPD, her lung function says
```

MIdeps@uslegalsupport.com          U. S. LEGAL SUPPORT          Phone: 888.644.8080
Ann Arbor | Detroit | Flint | Jackson     Bingham Farms/Southfield | Grand Rapids     Lansing | Mt. Clemens | Saginaw | Troy

Exhibit 3- 20

```
 1   she has COPD.  So, that's what I did.

 2        Q.   All right.  So, basically at this point

 3   you have shut down any autopsy service business?

 4        A.   Yes.

 5        Q.   And that's by agreement and you have a

 6   temporary restraining order that has been

 7   finalized that says that you cannot provide

 8   autopsy services unless you're referred directly

 9   from a member of the State Board of Healing Arts?

10        A.   Correct.

11        Q.   And that during the time that you do the

12   autopsy that I presume it's a public autopsy,

13   might be a private, but you have to have a

14   pathologist present at all times?

15             MR. WARD:  Object to form.

16        A.   According to them, yes.

17   BY MR. KJORLIE:

18        Q.   And then we've also -- in the criminal

19   case there's a bond saying we can't do any

20   autopsies?

21             MR. WARD:  Object to form.

22        A.   Correct.

23   BY MR. KJORLIE:

24        Q.   Notwithstanding all that, you have in

25   your vita, you have been qualified to testify
```

Exhibit 3- 21

PARCELLS, SHAWN LYNN
08/01/2019                                                                    Page 240

```
 1    under Daubert and different jurisdictions within

 2    the country?

 3         A.    I have.

 4         Q.    And you've listed those in your vita?

 5         A.    Yes.

 6         Q.    As a master's in clinical anatomy do you

 7    have a specialized knowledge in the area of that

 8    field?

 9              MR. WARD:  Object to form, assumes facts

10    not in evidence.

11         A.    Do I have specialized knowledge within?

12    BY MR. KJORLIE:

13         Q.    Within the field of forensic anatomy.

14              MR. WARD:  Object to form.

15         A.    Oh, yeah, I do.

16    BY MR. KJORLIE:

17         Q.    Okay.  So, you can look at matters and

18    you can see whether or not an injury is consistent

19    with a force applied?

20         A.    Correct.

21         Q.    You've testified that you've had

22    experience in Jackson County.  Weren't you also in

23    a coroner's office at LA?

24         A.    I spent time in Los Angeles, yes, and

25    also Denver.
```

MIdeps@uslegalsupport.com                  U. S. LEGAL SUPPORT                  Phone:  888.644.8080
Ann Arbor | Detroit | Flint | Jackson      Bingham Farms/Southfield | Grand Rapids      Lansing | Mt. Clemens | Saginaw | Troy

Exhibit 3- 22

PARCELLS, SHAWN LYNN
08/01/2019                                                              Page 241

```
 1        Q.   And based on that you were involved in

 2   providing gross anatomy services during the

 3   autopsies?

 4             MR. WARD:  Object to form.

 5        A.   Yes, in Los Angeles I was tasked with

 6   learning evisceration, grossing, and also

 7   evaluating injuries externally and internally to

 8   the body.

 9        BY MR. KJORLIE:

10        Q.   And would that be an area or a field that

11   would be akin to determining forces as they might

12   be applied to the human body and we call it

13   pattern of injury?

14             MR. WARD:  Object to form.

15        A.   Yes.  I do a lot of pattern injury

16   analysis.  You know, great example is child abuse

17   cases.  I had one case in which there was bruising

18   upon a child's abdomen and upon looking further at

19   it I felt that it was the exact outline of the,

20   somebody's foot stepping down on this child's

21   abdomen and subsequently I was asked if those

22   injuries internally were consistent with being

23   stepped on, which they were, and they later found

24   out that the mother had stepped on the child while

25   she was barefoot and that was -- I testified for
```

MIdeps@uslegalsupport.com            U. S. LEGAL SUPPORT            Phone:  888.644.8080
Ann Arbor | Detroit | Flint | Jackson     Bingham Farms/Southfield | Grand Rapids     Lansing | Mt. Clemens | Saginaw | Troy

Exhibit 3- 23

```
 1    the prosecution in that case.

 2         BY MR. KJORLIE:

 3         Q.   Okay, and in that you were certified

 4    under Daubert to testify?

 5             MR. WARD:  Object to form.

 6         A.   Yes.

 7         BY MR. KJORLIE:

 8         Q.   And that was a pattern of injury case,

 9    correct?

10         A.   Yes.

11         Q.   Did you list that case in your vita?

12         A.   I think it's in there, yeah.  Where's my

13    vita at?  Oh, here it is.  Oh, there's the

14    editorial board in there.  Missouri.  Should be in

15    here.  I know it's Texas.  Yeah, here it is.

16    Grand jury indictment, hearing of child abuse.

17    Scott County, Missouri, 2011.  Testified for the

18    prosecution on an autopsy we performed involving

19    child abuse.  Grand jury indicted both parties

20    accused.  Trial still pending as of 2011 I

21    believe --

22         Q.   What page is that on?

23         A.   8 of 13.

24         Q.   And it's the second one that's listed on

25    that page?
```

MIdeps@uslegalsupport.com                    U. S. LEGAL SUPPORT                    Phone: 888.644.8080
Ann Arbor | Detroit | Flint | Jackson    Bingham Farms/Southfield | Grand Rapids    Lansing | Mt. Clemens | Saginaw | Troy

Exhibit 3- 24

```
 1         A.    It's the second one, yes.

 2         Q.    Now --

 3         A.    And then there was a second one.

 4         Q.    Okay.

 5         A.    Actually, no, then I was deposed on it.

 6    I gave a deposition on that same case, was deposed

 7    by the defense explaining the cause of death and

 8    mechanism of injury surrounding the grand jury

 9    indictment of child abuse in Scott County.

10         Q.    Now, you've testified in cases for the

11    Missouri attorney general, have you not?

12         A.    Yes.  I testified for the Missouri AG's

13    office on a homicide, child homicide case.

14         Q.    Is that listed in your vita?

15         A.    Should be.  Texas, Georgia.  I thought it

16    was in here.  Here it is.

17         Q.    Okay.

18         A.    Testified for Missouri attorney general's

19    office regarding the performance of a forensic

20    autopsy of an abused child who was killed before

21    the fire was set.  Also testified to the chain of

22    custody procedures and procedures surrounding the

23    performance of the forensic autopsy and accepted

24    standards of performance of a typical forensic

25    autopsy.
```

Exhibit 3- 25

PARCELLS, SHAWN LYNN
08/01/2019                                                          Page 244

```
 1        Q.   That was less of a pattern of injury but

 2   more of a, something that would be toxicology?

 3             MR. WARD:  Object to form.

 4        A.   Yeah.  You know, they were trying to say

 5   that the chain of custody for the blood was

 6   tampered with and they didn't know it was really

 7   his blood, but we showed that that wasn't the

 8   case.

 9             (THEREUPON, Parcells Deposition Exhibit

10   No 20 was marked for identification.)

11             MR. KJORLIE:  In the -- I guess we better

12   mark this.  This has previously been marked.  This

13   is your report of November 17th.  Whoop, I'm going

14   to have to redo it.  I didn't do the front and

15   back.  Won't take long.

16             THE WITNESS:  I have a copy right here.

17   Here it is.

18             MR. KJORLIE:  Yeah, but you don't have

19   the photographs.

20             THE WITNESS:  Okay.

21             THE VIDEOGRAPHER:  It's 6:23 p.m., we're

22   going off the record.

23             (THEREUPON, an off the record discussion

24   was held; WHEREUPON, Parcells Deposition Exhibit

25   No 21 was marked for identification.)
```

MIdeps@uslegalsupport.com                  U. S. LEGAL SUPPORT                    Phone:  888.644.8080
Ann Arbor | Detroit | Flint | Jackson      Bingham Farms/Southfield | Grand Rapids      Lansing | Mt. Clemens | Saginaw | Troy

Exhibit 3- 26

PARCELLS, SHAWN LYNN
08/01/2019                                                                    Page 245

```
 1              THE VIDEOGRAPHER:  It's 6:26 p.m., we're
 2   back on the record.
 3         BY MR. KJORLIE:
 4         Q.   Mr. Parcells, I'm handing you what's been
 5   marked Parcells Exhibit No. 21.
 6         A.   Okay.
 7         Q.   That was attached to one of the reports I
 8   had consistent with your report of November 14,
 9   2017, concerning this matter.
10         A.   Uh-huh.
11         Q.   And those photographs were reviewed by
12   you at the time that you prepared the report?
13         A.   Yes.
14         Q.   And you attached that to your report?
15         A.   I did.
16         Q.   And those photographs show the roof
17   crush, correct?
18         A.   Yes.
19         Q.   And also the, the front of the vehicle as
20   well as the rear views?
21         A.   Yes.
22         Q.   Were those photographs utilized by you in
23   this case?
24         A.   Yes, they were.
25         Q.   You have reviewed and, I don't have it in
```

MIdeps@uslegalsupport.com                    U. S. LEGAL SUPPORT                     Phone: 888.644.8080
Ann Arbor | Detroit | Flint | Jackson    Bingham Farms/Southfield | Grand Rapids   Lansing | Mt. Clemens | Saginaw | Troy

Exhibit 3- 27

PARCELLS, SHAWN LYNN
08/01/2019                                                                                    Page 246

```
 1   front of me, but it's the excerpts, the deposition

 2   excerpts from Matt Wurm, the plaintiff in this

 3   case?

 4        A.   Uh-huh.

 5        Q.   I don't know which, which one that is.

 6   Is that...

 7        A.   I don't have it.

 8        Q.   There it is.  Parcells Exhibit No. 9.

 9        A.   I just want to put these back where they

10   go.  Okay.

11        Q.   Handing you -- that's been marked

12   Parcells Exhibit No. 9?

13        A.   Uh-huh.

14        Q.   And that's a description by Mr. Wurm

15   about how his body moved about during this

16   incident, correct?

17             MR. WARD:  Object to form.

18        BY MR. KJORLIE:

19        Q.   For example, on page 83, line 10 through

20   17.

21             MR. WARD:  So, to extent that's a

22   question I'll object to form.

23        BY MR. KJORLIE:

24        Q.   Okay, well, he indicates that he was

25   still in the rear seat when the vehicle stopped
```

MIdeps@uslegalsupport.com                    U. S. LEGAL SUPPORT                    Phone:  888.644.8080
Ann Arbor | Detroit | Flint | Jackson     Bingham Farms/Southfield | Grand Rapids     Lansing | Mt. Clemens | Saginaw | Troy

Exhibit 3- 28

```
 1    rolling on its four wheels, correct?

 2         A.    Yes.

 3         Q.    And is that consistent with your

 4    understanding of his position in the vehicle at

 5    the time?

 6         A.    That, and above that, I mean, I know he

 7    talks about he was all balled up sitting in the

 8    seat, but he's twisted a little bit he says.

 9         Q.    And that's on the same page?

10         A.    Yep.

11         Q.    Is that consistent with your findings in

12    your report?

13              MR. WARD:  Object to the form.

14         A.    I mean, yes.  Basing off of where he was

15    seated and the fact he stayed seated tells me that

16    what I had discussed earlier in the deposition

17    about the forces upon the spine and the body, that

18    would be consistent with that.

19              BY MR. KJORLIE:

20         Q.    Is there anything in his deposition where

21    he told about the position of his seat and how his

22    body reacted to the forces that would have changed

23    in any way your opinion in this case in your

24    initial report?

25              MR. WARD:  Object to the form.
```

MIdeps@uslegalsupport.com                    U. S. LEGAL SUPPORT                  Phone:  888.644.8080
Ann Arbor | Detroit | Flint | Jackson     Bingham Farms/Southfield | Grand Rapids     Lansing | Mt. Clemens | Saginaw | Troy

Exhibit 3- 29

```
 1        A.    No.  I -- no.  I mean, he talks about

 2    hitting his head and the position of his body,

 3    yes.

 4        BY MR. KJORLIE:

 5        Q.    Okay, and what kind of forces again do

 6    you believe were applied to his body at the time

 7    that he incurred his spinal injuries in this

 8    matter?

 9        A.    What kind of forces again?

10        Q.    What kind of force?

11        A.    During the rollover?

12        Q.    Yes.

13        A.    Well, he -- again, because of the

14    whipping motion he would be -- essentially the G

15    force would be pulling him down, but at the same

16    time as it's whipping there's going to be the same

17    force that's going to be wanting to try and take

18    him out of the vehicle.  That's why the driver was

19    ejected, but I noticed that the window is much

20    smaller in the back versus the front.  Probably

21    explains why the driver went out and Mr. Wurm

22    didn't, and then there's going to be axial loading

23    upon his spine that it created the compression

24    fractures and I feel that that, to the degree of

25    the fractures and how many, it indicates to me
```

MIdeps@uslegalsupport.com               U. S. LEGAL SUPPORT               Phone:  888.644.8080
Ann Arbor | Detroit | Flint | Jackson    Bingham Farms/Southfield | Grand Rapids    Lansing | Mt. Clemens | Saginaw | Troy

Exhibit 3- 30

 1    that even though I agree that he would be during a

 2    rollover going towards the roof, I believe that

 3    the roof would be coming down at a greater speed

 4    than him going towards the roof and thus producing

 5    a much more significant force upon his spine.

 6         Q.   We discussed a little bit Parcells

 7    Exhibit No. 13, Spinal Trauma, and you cited that

 8    as a recognized treatise within the field of

 9    spinal trauma?

10         A.   Yes.

11         Q.   And you had pages, pages marked in there?

12         A.   I did.

13         Q.   And is this consistent with your opinion

14    as to the type of force that was applied to Mr.

15    Wurm at the time of the rollover incident?

16              MR. WARD:  Object to the form.

17         A.   Yeah.  I mean, it talks about axial load

18    injuries.

19         BY MR. KJORLIE:

20         Q.   On page, is there a page 165 on that

21    report?

22         A.   No.  It starts at 166, but on 167 it

23    talks about axial load injury.

24         Q.   What is the type of load, in your

25    professional opinion, that resulted in injuries to

MIdeps@uslegalsupport.com                U. S. LEGAL SUPPORT                Phone:  888.644.8080
Ann Arbor | Detroit | Flint | Jackson        Bingham Farms/Southfield | Grand Rapids        Lansing | Mt. Clemens | Saginaw | Troy

Exhibit 3- 31

 1    the plaintiff's spine in this rollover incident?

 2              MR. WARD:  Object to the form.

 3         A.   Axial load is what was, caused his

 4    injuries.

 5         BY MR. KJORLIE:

 6         Q.   And I see on page 165 of that exhibit,

 7    it's not -- we didn't put that in there, but it

 8    talks about force vectors.

 9         A.   Okay.  Oh, okay.

10         Q.   What are force vectors?

11         A.   Well, this is in a -- this is discussing

12    force vectors of flexion compression injury.  He

13    did not have a, what's called a flexion

14    compression injury, meaning that as the spine is

15    flexed forward it compresses the vertebrae and

16    causes an injury.

17         Q.   Okay.

18         A.   His was axial forces.

19         Q.   Okay, but the force vector in your

20    opinion is an axial load?

21         A.   Yeah, the force vector is an axial load

22    coming down.

23         Q.   Straight down?

24         A.   Yes.

25         Q.   Okay.

MIdeps@uslegalsupport.com                    U. S. LEGAL SUPPORT                    Phone:  888.644.8080
Ann Arbor | Detroit | Flint | Jackson    Bingham Farms/Southfield | Grand Rapids    Lansing | Mt. Clemens | Saginaw | Troy

Exhibit 3- 32

PARCELLS, SHAWN LYNN
08/01/2019                                                                Page 251

```
 1        A.   And the force is -- basically axial

 2   loading results in shear and tensile forces

 3   highest at the base of the pedicle and the

 4   superior margin of the vertebral body where the

 5   microstructure of trabecular pattern demonstrates

 6   changes consistent with this region being a focus

 7   of stress concentration, the forces transmitted to

 8   the pedicle base result in an anterior shear

 9   force.  This is combined with simultaneous axial

10   compression of the vertebral body from above by

11   the nucleus pulposus which explodes into the

12   intervertebral endplate to result in the

13   centripetal displacement of the body and its

14   fracture fragments.

15        Q.   And in your opinion --

16             MR. WARD:  I'll object --

17        A.   -- as a clinical anatomist --

18             THE REPORTER:  Wait, he was objecting.

19             MR. KJORLIE:  Oh, I'm sorry.

20             MR. WARD:  I'll object to the extent

21   you're just reading from the textbook.

22        A.   I can explain it if I need to.  I just --

23   basically what that is saying is that when you

24   have an axial force you have a force --

25             BY MR. KJORLIE:
```

MIdeps@uslegalsupport.com                    U. S. LEGAL SUPPORT                    Phone:  888.644.8080
Ann Arbor | Detroit | Flint | Jackson        Bingham Farms/Southfield | Grand Rapids        Lansing | Mt. Clemens | Saginaw | Troy

Exhibit 3- 33

PARCELLS, SHAWN LYNN
08/01/2019                                                                      Page 252

```
 1       Q.   You're holding up a spine?

 2       A.   Yep.

 3       Q.   A human spine?

 4       A.   Correct.

 5       Q.   Okay.

 6       A.   And what they're saying is the highest

 7  tensile forces are at the base of the pedicle and

 8  superior margin of the vertebral body.  Well, this

 9  would be the superior margin of the vertebral

10  body.  (Indicating).

11       Q.   And where is that where you're pointing

12  on the model?

13       A.   I'm just talking in generality of any

14  vertebra.  This would be superior, inferior.  So,

15  superior margin here and then the base of the

16  pedicle, which is the pedicles are right here.

17  (Indicating).

18       Q.   On the side of the spine?

19       A.   Correct, and, so, you have the highest

20  here in the base of the pedicle while at the same

21  time you have axial forces coming down because

22  you've got the forces being transmitted through

23  the disc.  So, the disc is pushing down but then

24  you have forces coming down here and --

25       Q.   By here is where on the model?
```

MIdeps@uslegalsupport.com                    U. S. LEGAL SUPPORT                    Phone:  888.644.8080
Ann Arbor | Detroit | Flint | Jackson        Bingham Farms/Southfield | Grand Rapids        Lansing | Mt. Clemens | Saginaw | Troy

Exhibit 3- 34

PARCELLS, SHAWN LYNN
08/01/2019                                                                                    Page 253

```
 1        A.   Sorry, superior margin and the base, and
 2   you have forces from the nucleus pulposus through
 3   the disc and it results in the forces being
 4   transmitted from the front and back to the center
 5   and that's how you get these compression
 6   fractures.
 7        Q.   Okay, and it's your opinion based upon
 8   reasonable anatomist practice that -- that is
 9   based upon reasonable anatomist certainty?
10        MR. WARD:  Object to the form.
11        A.   Yeah.  Based upon a reasonable medical
12   certainty.
13        BY MR. KJORLIE:
14        Q.   In the field of clinical anatomy?
15        A.   Yes.  I feel --
16        MR. WARD:  Same objection.
17        A.   -- that those injuries to Mr. Wurm are
18   axial forces.
19        BY MR. KJORLIE:
20        Q.   Okay.  Consistent with roof crush?
21        MR. WARD:  Object to form, calls for
22   speculation, assumes facts not in evidence.
23        A.   Yes.  I mean, I, I do feel that he was
24   going towards the roof, but I believe that the
25   roof was coming down on him faster than he was
```

MIdeps@uslegalsupport.com                U. S. LEGAL SUPPORT                Phone:  888.644.8080
Ann Arbor | Detroit | Flint | Jackson     Bingham Farms/Southfield | Grand Rapids     Lansing | Mt. Clemens | Saginaw | Troy

Exhibit 3- 35

```
 1   going towards the roof thus producing the forces

 2   upon his head down to his pelvis.

 3       BY MR. KJORLIE:

 4       Q.   To result in the injuries that he

 5   sustained?

 6       A.   Correct.

 7       Q.   Now, handing you Parcells Exhibit No. 10

 8   and this is a, the right passenger Pagan, William

 9   Pagan, illustrates the injury that he sustained,

10   correct?

11       A.   That's what I was told that this picture

12   represents, yes.

13       Q.   Okay.  Evaluating that injury, how does

14   that equate with your opinions concerning

15   plaintiff, plaintiff's injuries?

16           MR. WARD:  Object to the form, incomplete

17   hypothetical, calls for speculation, assumes facts

18   not in evidence.

19       A.   It tells me that there was some sort of a

20   force that came down upon his head that produced

21   this injury.

22       BY MR. KJORLIE:

23       Q.   Not him diving into the roof, but the

24   roof crushing down at the time of the rollover?

25           MR. WARD:  Same objection.
```

MIdeps@uslegalsupport.com                 U. S. LEGAL SUPPORT                 Phone:  888.644.8080
Ann Arbor | Detroit | Flint | Jackson   Bingham Farms/Southfield | Grand Rapids   Lansing | Mt. Clemens | Saginaw | Troy

Exhibit 3- 36

```
 1        A.   I'm assuming that, that this was the roof
 2   that, that produced this injury, yes.
 3        BY MR. KJORLIE:
 4        Q.   Okay.  And it was not because he dived
 5   into the roof, but because the roof crushed down
 6   on his head?
 7             MR. WARD:  Same objections, speculation.
 8        A.   I don't want to speculate that -- he
 9   didn't have some of the same injuries that Mr.
10   Wurm had.  First of all, where was he sitting?
11        BY MR. KJORLIE:
12        Q.   He was the right rear passenger.
13        A.   Okay.
14        Q.   He was sitting right there.
15   (Indicating).
16        A.   Right there, okay.  The roof could have
17   come down upon him and produced this injury.  That
18   is a probable or a possible mechanism.
19        Q.   Okay, and he did not receive any spinal
20   injuries in this case?
21        A.   Not that I know of, no.
22             MR. WARD:  Absolute speculation.
23        Q.   The -- each of these individuals
24   experienced different types of injuries in this
25   rollover?
```

Exhibit 3- 37

```
 1              MR. WARD:  Assumes facts not in evidence,
 2    calls for speculation.
 3         A.   That's what I've been told, yes.
 4    BY MR. KJORLIE:
 5         Q.   Driver was thrown out of the vehicle?
 6         A.   Uh-huh, yes.
 7         Q.   The front passenger had a seat belt on,
 8    had a knee injury?
 9         A.   Yes.
10         Q.   The little -- the girl in the back
11    between the right rear and left rear passengers
12    sustained a compound fracture of her arm and
13    spinal injury?
14         A.   Yes.
15              MR. WARD:  Assumes facts not in evidence.
16    BY MR. KJORLIE:
17         Q.   And William Pagan, the right rear
18    passenger, had a lacerated scalp?
19         A.   Yes.
20         Q.   And then the plaintiff in this case had
21    his injuries?
22         A.   Yes.
23         Q.   And are all these consistent with your
24    understanding of the forces that would be applied
25    in a rollover accident?
```

MIdeps@uslegalsupport.com                    U. S. LEGAL SUPPORT                    Phone:  888.644.8080
Ann Arbor | Detroit | Flint | Jackson    Bingham Farms/Southfield | Grand Rapids    Lansing | Mt. Clemens | Saginaw | Troy

Exhibit 3- 38

PARCELLS, SHAWN LYNN

```
 1       A.   You have the --

 2            MR. WARD:  Let me object.

 3            THE WITNESS:  Oh, sorry.

 4            MR. WARD:  Speculation, assumes facts not

 5   in evidence, incomplete hypothetical, call --

 6   outside this witness's area of expertise.  You can

 7   answer if you can.

 8       BY MR. KJORLIE:

 9       Q.   Because each of these individuals had

10   separate injuries, would their force vectors be

11   different in reference to evaluating their

12   injuries?

13            MR. WARD:  Incomplete hypothetical, calls

14   for speculation, assumes facts not in evidence.

15       BY MR. KJORLIE:

16       Q.   Go ahead and answer.

17       A.   Yeah.  I mean, the fact that they had

18   different injuries, the fact that the driver was

19   thrown out, the fact that the female had a

20   compound fracture, the fact that the front

21   passenger was seat belted in and only had a knee

22   injury tells me that yes, they would have had, you

23   know, probable -- well, depending on their seating

24   position, the force vectors are going to be

25   different and depending on those force vectors and
```

Exhibit 3- 39

PARCELLS, SHAWN LYNN
08/01/2019                                                           Page 258

```
 1    forces applied upon their body may produce

 2    different injuries as were seen.

 3         Q.   I think we've had this somewhere, but

 4    handing you what's been marked Wurm Exhibit 15.

 5    Have you seen that document before?

 6         A.   Yes.  It's Wurm's affidavit.

 7         Q.   And in that you were provided on the last

 8    page a, kind of a general summary of what the

 9    plaintiff's counsel thought might be important?

10         A.   Yes.

11         Q.   Not that I have any specialized

12    credentials in this area.  You did have a chance

13    to review that?

14         A.   Yes.

15         Q.   Okay, and that was reviewed prior to your

16    completing your report?

17         A.   Yes.

18              MR. WARD:  Object to the form of the

19    question.  What's the date of the Email?

20              MR. KJORLIE:  Hey now.

21              THE WITNESS:  Let's see.

22              MR. KJORLIE:  It's in the record.

23              THE WITNESS:  June, June 8 -- May 5th,

24    2017.

25              MR. KJORLIE:  Now, I don't want to get in
```

MIdeps@uslegalsupport.com                **U. S. LEGAL SUPPORT**                Phone:  888.644.8080
Ann Arbor | Detroit | Flint | Jackson    Bingham Farms/Southfield | Grand Rapids    Lansing | Mt. Clemens | Saginaw | Troy

Exhibit 3- 40

```
 1   trouble, but I'm going to go ahead and get in

 2   trouble.  Excuse me while I make a copy of this.

 3           THE VIDEOGRAPHER:  It's 6:46 p.m., we're

 4   going off the record.

 5           (THEREUPON, an off the record discussion

 6   was held; WHEREUPON, Parcells Deposition Exhibit

 7   No 22 was marked for identification.)

 8           THE VIDEOGRAPHER:  It's 6:50 p.m., we're

 9   back on the record.

10       BY MR. KJORLIE:

11       Q.   Mr. Parcells, I'm handing you what's been

12   marked Exhibit No. 22.

13       A.   Okay.

14       Q.   Can you identify that document?

15       A.   Oh, this is an Email I sent you last,

16   back in June.

17       Q.   And this is in reference -- well, this is

18   last month, correct?

19       A.   Yes.

20       Q.   This is the list of cases testified or

21   gave deposition?

22       A.   Yes.

23       Q.   And in there we, I highlighted use of

24   statistical analysis with a causation ratio

25   analysis, et cetera, correct?
```

MIdeps@uslegalsupport.com                    U. S. LEGAL SUPPORT                    Phone: 888.644.8080
Ann Arbor | Detroit | Flint | Jackson     Bingham Farms/Southfield | Grand Rapids     Lansing | Mt. Clemens | Saginaw | Troy

Exhibit 3- 41

PARCELLS, SHAWN LYNN
08/01/2019                                                              Page 260

```
 1      A.   Yes.

 2      Q.   Did you utilize that as a technique in

 3  providing your report?

 4           MR. WARD:  Object to the form of the

 5  question.

 6      BY MR. KJORLIE:

 7      Q.   Is that what we were talking about --

 8      A.   Oh, that's what we were talking about

 9  earlier that I'm going to have to reproduce, yes.

10      Q.   Okay, and we'll supplement and provide

11  that information.

12      A.   Correct.

13           MR. KJORLIE:  All right.  Now, this is

14  the last one.

15           (THEREUPON, Parcells Deposition Exhibit

16  No 23 was marked for identification.)

17      BY MR. KJORLIE:

18      Q.   Handing you what has been marked 23.

19  Here, Steve.

20           MR. WARD:  Yeah, I have a copy of that

21  one.

22      BY MR. KJORLIE:

23      Q.   Mr. Parcells, I'm handing you what's been

24  marked Parcells Exhibit No. 23.  Can you identify

25  that?
```

MIdeps@uslegalsupport.com                    U. S. LEGAL SUPPORT                    Phone:  888.644.8080
Ann Arbor | Detroit | Flint | Jackson     Bingham Farms/Southfield | Grand Rapids     Lansing | Mt. Clemens | Saginaw | Troy

Exhibit 3- 42

PARCELLS, SHAWN LYNN
08/01/2019                                                          Page 261

```
 1        A.    Oh, this is just an Email to you back in

 2   July.

 3        Q.    And -- this month?

 4        A.    Well, we're in August now, so, this would

 5   have been July 1.

 6        Q.    Okay, and in reference to that you

 7   mentioned a topic, correct?

 8        A.    Yes.

 9        Q.    What was that topic?

10        A.    Spinal anatomy.

11        Q.    Can you expound on that particular

12   comment?

13              MR. WARD:  Objection, vague, broad, calls

14   for speculation.

15        A.    Spinal anatomy is a course that I took

16   when I was going through the chiropractic program

17   in Kansas City at Cleveland.  Obviously

18   chiropractors focus on the spine and because of

19   that we were required to not only take general

20   anatomy courses and general radiology courses, but

21   we also were required to take specific courses to

22   the spine, since that's a focus of area for

23   treatment for chiropractors.  We discussed

24   everything from spinal anatomy to physiology to

25   development of the spine to differences in
```

Exhibit 3- 43

PARCELLS, SHAWN LYNN
08/01/2019                                                                 Page 262

```
 1   pediatric spine and issues with the pediatric

 2   spine versus the adult spine.  We did spinal

 3   radiology and also had to in a lab setting be able

 4   to walk up to a table and identify with a

 5   disarticulated spine -- for example, if they put

 6   L2 and T12 on a table we had to identify where

 7   those vertebrae would go and what type of

 8   vertebrae they are.

 9        BY MR. KJORLIE:

10        Q.   Okay, and that training and education has

11   been a part of your explanation of the spinal

12   injuries that the plaintiff incurred in this case?

13             MR. WARD:  Object to the form.

14        A.   Yeah.  I mean, my specialty in spinal

15   anatomy would -- oh, and we also talked about

16   biomechanics, I forgot to add that, but I think I

17   added that earlier when he asked about it; but the

18   spinal anatomy information that I learned

19   definitely would have gone into and have been used

20   in my analysis of this case, yes.

21        BY MR. KJORLIE:

22        Q.   So, your topics that you discussed

23   earlier about biomechanics is in reference to the

24   spine and the properties and characteristics of

25   the spine, correct?
```

```
 1        A.    Yes.

 2        Q.    Not to some lab study dropping people out

 3   of a building to determine pattern of injury?

 4        A.    True, yeah, yeah.

 5        Q.    Or using cadavers or dummies?

 6        A.    That would be interesting, but no, I have

 7   not done that.

 8        Q.    Okay.  Now, are all the opinions that

 9   you've provided today based upon reasonable

10   medical certainty in your specialty of human

11   anatomy?

12        A.    Yes.

13        MR. KJORLIE:  No further questions.

14        REDIRECT-EXAMINATION

15        BY MR. WARD:

16        Q.    I have to follow up on a few of them.

17        A.    Okay.

18        Q.    Number one, you mentioned earlier today

19   that a pathology assistant is different than a

20   pathologist assistant?

21        A.    Oh, yeah, yeah.

22        Q.    Tell me what the difference is.

23        A.    Okay, so, there are certified pathologist

24   assistants.  Now to become certified you have to

25   attend a program.  It's typically a master's, but
```

MIdeps@uslegalsupport.com              U. S. LEGAL SUPPORT              Phone: 888.644.8080
Ann Arbor | Detroit | Flint | Jackson    Bingham Farms/Southfield | Grand Rapids    Lansing | Mt. Clemens | Saginaw | Troy

Exhibit 3- 45

```
 1        A.   Yes.

 2        Q.   And that's something you did in this

 3   case?

 4        A.   It is.

 5        Q.   Now, referencing this exhibit there is a

 6   example of extensive roof crush following a

 7   rollover on page 321?

 8        A.   Yes.

 9        Q.   And that talks about loads to the spine?

10        A.   Correct.

11        Q.   Then on page 322 there's rollover crashes

12   and discussing the automotive industry

13   researcher's postulating diving theory, correct?

14        A.   Correct.

15        Q.   And then in there there is case specific

16   investigation and analysis, correct?

17        A.   Yes.

18        Q.   And you reviewed this at the time that

19   you rendered your report in this matter?

20             MR. WARD:  Object to the form of the

21   question.

22        A.   Yes, I used this material.

23             BY MR. KJORLIE:

24        Q.   There is on page -- if I can find it --

25   it talks about roof crush, correct?
```

MIdeps@uslegalsupport.com                    U. S. LEGAL SUPPORT                    Phone: 888.644.8080
Ann Arbor | Detroit | Flint | Jackson     Bingham Farms/Southfield | Grand Rapids     Lansing | Mt. Clemens | Saginaw | Troy

Exhibit 3- 46

```
 1        A.    Which page again?

 2        Q.    Well, strike that.  It talks about, on

 3   page 323, roof crush up to 10 inches?

 4        A.    Yes, I see that.

 5        Q.    There's something in here in that same

 6   paragraph, generally the level at which roof crush

 7   is considered to be associated with excess injury

 8   is when it exceeds six inches; do you see that?

 9        A.    I do see that.

10             MR. WARD:  Objection.

11        BY MR. KJORLIE:

12        Q.    And you went ahead and utilized this and

13   made this a part of your report?

14             MR. WARD:  Object to the form.

15        A.    When I was initially writing my report

16   my, my biggest theory that came from this was the

17   difference between diving, in other words, that

18   when the roof -- when the roof hits the ground the

19   roof remains stationary and the occupant is moving

20   towards the roof, versus the fact that when the

21   roof hits the ground it remains stationary but the

22   rest of the vehicle is still moving at a downward

23   force causing that roof intrusion to come in and

24   hit the occupant in the head.  All of my training

25   in the sciences, including physics, tell me that
```

MIdeps@uslegalsupport.com                       U. S. LEGAL SUPPORT                       Phone:  888.644.8080
Ann Arbor | Detroit | Flint | Jackson       Bingham Farms/Southfield | Grand Rapids       Lansing | Mt. Clemens | Saginaw | Troy

Exhibit 3- 47

PARCELLS, SHAWN LYNN
08/01/2019                                                                                   Page 276

```
 1    even during the split second that the truck hit

 2    the ground before it ended up moving back over,

 3    that it makes sense that instead of Mr. Wurm going

 4    into the roof, which I don't think would have

 5    produced as much injury, versus as the roof coming

 6    towards him, but really that the truck and his

 7    bottom are still moving towards, causing the roof

 8    to come in and smack his head at a greater force

 9    than him diving into it.

10            MR. KJORLIE:  I have no further

11    questions.

12            REDIRECT-EXAMINATION

13       BY MR. WARD:

14       Q.   Looking at page, at this exhibit, what

15    number is it?

16       A.   25.

17            MR. KJORLIE:  25.

18       BY MR. WARD:

19       Q.   Page 320, there's basically a formula?

20       A.   Uh-huh.

21       Q.   Is that the formula that you believe you

22    used to prepare your risk ratio?

23       A.   Yes, yes, I did and then you see how you

24    can come and convert it out into a percentage.

25       Q.   Right, and, so, my question to you is as
```

MIdeps@uslegalsupport.com                    U. S. LEGAL SUPPORT                    Phone:  888.644.8080
Ann Arbor | Detroit | Flint | Jackson    Bingham Farms/Southfield | Grand Rapids    Lansing | Mt. Clemens | Saginaw | Troy

Exhibit 3- 48

Exhibit 4



# Appino Biggs Reporting Service, Inc.

## Technology Specialist in Today's Litigation

**Date:**   September 17, 2019                                           **A&B File No.:**   54524

**To:**      Counsel of Record      Mr. Steven E. Ward

**To:**      Deponent      Shawn Lynn Parcells

**In Re:**   Mathew R. Wurm vs. Ford Motor Company, a Delaware Corporation

_____    **Counsel of Record** - Signature of the deposition is required.
Please have the deponent make corrections/changes if any, on the errata sheet ONLY. Sign name on the form where indicated and sign the certificate before a notary. Please return ONLY the original executed, notarized certificate and completed, signed errata to our offices within 30 days from the date this is received. If you have any questions please call our office.

_____    **Deponent** - Since you did not waive reading and signing of the transcript of your deposition, your notarized signature is required. Please read the copy of the transcript of your deposition, make any corrections necessary on the errata sheet ONLY, sign the bottom of the errata sheet, sign the certificate where indicated BEFORE A NOTARY and return the errata sheet and original executed, notarized certificate within 30 days from the date this is received.

___X___    The attached executed and notarized copies of certificate(s) and errata sheet(s) were returned to our office on       September 13, 2019       and are sent to you for your files. If you have any questions, please call our office.

_____    Synchronized voice/video to text CD/DVD to be inserted in the transcript of the above referenced deponent.

_____    Please file the attached original(s) in the appropriate court file.

_____    Enclosed please find: _____

**cc:**      Mr. Eric Kjorlie _____

800 E. 1st Street, Suite 305          511 SW 21st Street          6420 W. 95th Street, Suite 101
Wichita, KS 67202                    Topeka, KS 66604            Overland Park, KS 66212
316·201·1612                         785·213·3063               913·383·1131

www.appinobiggs.com

Exhibit 4- 1

PARCELLS, SHAWN LYNN
08/01/2019                                                                    Page 282

```
 1                    DEPOSITION ERRATA SHEET

 2    .

 3    RE:       APPINO & BIGGS REPORTING SERVICE, INC.

 4    .

 5    FILE NO.: 54524

 6    .

 7    CASE:     MATHEW R. WURM vs.

 8         FORD MOTOR COMPANY, a Delaware Corporation

 9    .

10    DEPONENT: SHAWN LYNN PARCELLS

11    .

12    DEPOSITION DATE: 08/01/2019

13    .

14    To the Reporter:

15    I have read the entire transcript of my Deposition

16    taken in the captioned matter or the same has been

17    read to me.  I request that the following changes

18    be entered upon the record for the reasons

19    indicated.  I have signed my name to the Errata

20    Sheet and the appropriate Certificate and

21    authorize you to attach both to the original

22    transcript.

23    .

24    .

25    .
```

Exhibit 4- 2

PARCELLS, SHAWN LYNN
08/01/2019                                                                      Page 283

| 1 | PAGE:LINE FROM | TO | REASON |

2  · Deposition changes consisting

3  · of 5 pages and exhibit 25

4  · additional pages 325-326. SLP

5  ·

6  ·

7  ·

8  ·

9  ·

10 ·

11 ·

12 ·

13 ·

14 ·

15 ·

16 ·

17 ·

18 ·

19 ·

20 ·

21 ·

22 ·

23 ·

24 SIGNATURE:_____   DATE: 9/13/19

25          SHAWN LYNN PARCELLS

Exhibit 4- 3

SHAWN LYNN PARCELLS DEPOSITION ERRATA SHEET INSERT @Page 283

RE: Wurm vs. Ford Motor Company- Parcells Deposition taken 08/01/2019

## PARCELLS DEPOSITION CORRECTIONS

Shawn Lynn Parcells' Deposition Corrections 9/13/2019

RE: Wurm vs. Ford Motor Company- pg. 1

**PAGE: LINE**

**Correction**                                                **Reason for Correction**

128/9          Add the following sentences after "axial          To provide proper meaning.

load injuries.": ""For example, the flexion

compression mechanism of injury to Mr. Wurm

or in layman's terms 'his pattern of injury'

was a result of the force of the roof crush to

his spine while he was in a sitting position, and

as depicted in Parcells' Exhibit 13 at Page 166

while as an example in the Report of Ford's Expert

Elizabeth H. Raphael, M.D., F.A.C.E.P. at page 11 of

her 22-page Report of September 6, 2019 her

description of the motorcycle injury was not

consistent with Mr. Wurm's actual radiological

findings because Dr. Raphael's example of

mechanism of injury would not result in the pattern

of injury of Mr. Wurm's experienced based

upon my education, training and experience , and

from the recognized scientific literature in the

field of spinal trauma stated in Parcells' Exhibit 13

Exhibit 4- 4

Shawn Lynn Parcells' Deposition Corrections

RE: Wurm vs. Ford Motor Company- pg. 2

as her motorcyclist example would have more
likely than not have resulted in the motorcyclist
experiencing  anterior wedging to his thoracic spine
radiological finding was not present in Mr.
Wurm.

| 146/18 | Add after sentence "however the kinematics | To correct my testimony to |
|---|---|---|
| | of one wearing the seatbelt and not wearing | accurately reflect fact |
| | a seatbelt in this case would be slight and | |
| | would not have altered or changed Mr. Wurm's | |
| | injuries to his spine because all the occupants in | |
| | the truck stayed in their seats except the driver | |
| | who was thrown from the truck which the | |
| | literature supports as what would normally occur. | |
| | Also this fact I am now informed was testified | |
| | to by all the occupants. | |

| 147/10 | Delete my answer and add: "I have reviewed the | I was mistaken and relied |
|---|---|---|
| | facts after the deposition and there is no indication | upon a misstatement of |
| | in in any of the deposition of the occupants to the | Counsel.  To correct my |
| | truck material that Mr. Wurm "was flailing  all | testimony to accurately |
| | about and bouncing around and in the truck during | reflect fact |
| | the rollover event" as represented by Counsel.  I have | |
| | reviewed Mr. Wurm's testimony and all of the | |

Exhibit 4- 5

Shawn Lynn Parcells' Deposition Corrections

RE: Wurm vs. Ford Motor Company- pg. 3

occupants and this was never said by any of them.
Mr. Wurm testified that he remembers feeling
suspended in space and feeling like dead weight
when he experienced a sharp pain to his back.
All evidence is that all of the occupants other than
the driver remained in their seats during the entire
rollover event.

| | | |
|---|---|---|
| 170/7 | Delete "Most likely" and add "I don't Know if he was leaning or not, it Would be sheer conjecture on my Part". | To accurately reflect fact |
| 178/4 | After the word "lumbar" add "vertebrae because that is where the forces were the greatest." | To provide proper meaning |
| 179/21 | Delete "Yes, and I meant to say that" and add: "when the roof hit the ground, it remained stationary. However, as the truck was still on its top, the forces of hitting the ground means the ground | To provide proper meaning and better describe the forces of this stage of the event |

Exhibit 4- 6

Shawn Lynn Parcells' Deposition Corrections

RE: Wurm vs. Ford Motor Company- pg. 4

caused a roof to crush into Mr. Wurm."

214/8     Delete "Yes." and add: "No, the       To clarify the question
comparative risk ratio studies in Exhibit     asked by Counsel
25 on page 326 (attached) indicate that
the risk of serious head-neck (spinai column)
is 3.52- 8.2 times greater in observed roof
crush of 10 inches verses the alternative
scenario of less than 6 inches. Furthermore,
this same study and  showed that the subject's
failure to use the available seatbelt was no
casually related to his spinal injury (see
formula on page 326.

277/4     After the word "lumbar" add "vertebrae     To provide proper meaning
because that is where the forces were the
greatest."

277/14     After the word "denominator" add ", see     To clarify statement
formula on page 326 of Parcells' Exhibit 25.

Exhibit 4- 7

Shawn Lynn Parcells' Deposition Corrections

RE: Wurm vs. Ford Motor Company- pg. 5

276/9    Add "attached to these corrections are          This was inadvertently not

omitted Pages 325 and 326 of Parcells'          included in the exhibit although

Exhibit 25 (here attached to include the          I testified about it.

formula to substantiate that roof crush

in excess of 6 inches occupants have a

71-88% chance of serious neck (spinal) injury

Directly caused by roof crush)."

    I have read my Deposition Corrections consisting of four (4) pages signed below and also I have signed and dated my Deposition Errata Sheet on page 283 of my Deposition and attached pages 325 and 326 of Parcells' Deposition Exhibit 25 that were inadvertently not attached to Exhibit 25 at the time of the taking of my Deposition on 8/1/2019.

DATED: 9/13/19

SHAWN LYNN PARCELLS

Exhibit 4- 8

(NISS) that only included injuries to the neck and head, and called the head-neck NISS (HN-NISS).

The analysis employed a generalized estimating equation logistic regression approach to determine the odds of HN-NISS $\geq 9$ (the cut point at which injury was considered "serious"). This statistical model allows for the evaluation of the relative strength of the injury prediction variables that were considered for the model. First, the variables were examined in a univariable model in which the strength of the variable to predict injury was evaluated without controlling for the effect of other variables. The strongest and most statistically valid variables were then put into a multivariable model, which allowed for the evaluation of how the variables interact. The weakest variables were taken out and put back into the model in a "stepwise" fashion to see which ones had the greatest effect on the model, and then the final model of the strongest and most valid predictors of injury were arrived at.

After following the previously described process of variable elimination, the final model for predicting serious head/neck injury included roof crush, air bag deployment, seat belt use, and age. Although seat belt use was not statistically significant in the model ($p = 0.056$), it was kept in the final model because of the high odds ratio (OR) associated with the variable (1.90). The results of the model that were applicable to the subject case indicated a 3.5 times greater risk of serious head/neck injury for an occupant exposed to a rollover crash with roof crush of 25 cm (10 inches) versus less than 15 cm (6 inches) of roof crush (95% CI; 1.1, 11.0).

### Analysis 2

The second analysis performed for the case was a nested case–control study, in which 155 serious neck-injured cases were "nested" among the Type M occupants, and compared to 155 uninjured controls "nested" among the Type O occupants. The criteria for matching the controls to the cases were that they had to be front seat occupants in the same vehicle, so that the severity of the crash, with regard to number of rolls and type of crash, was the same for both. The analytic technique used to model the odds of being an injured case versus an uninjured control was a conditional fixed-effects logistic regression. The advantage of the analysis was that variables that were vehicle specific and thus identical for both occupants could be omitted from the model.

The Abbreviated Injury Scale (AIS) ranking of serious (3+) neck injury served as the dependent variable in the analysis, and the proxy for the injury sustained by the subject in the investigated case, as cervical spinal cord injuries are deemed serious and greater in the AIS. The primary predictor variable in the study was the maximum amount of roof crush at the occupant's seating position, divided into two categories: <6 inches or $\geq 6$ inches (15 cm). Other potential predictor variables were assessed first in a univariable analysis and then examined in the multivariable model using a stepwise approach, as with the previously described study.

A final multivariable model was constructed for serious neck injury using roof crush, roll arc side, and occupant height. The largest single predictor of serious neck injury was roof crush of 6 inches or more (15 cm), at an odds ratio of 8.2 (95% CI; 2.1, 32.0). Occupying the side of the vehicle that was following, rather than leading the roll, was also a source of increased serious neck injury risk (OR = 4.0 (95% CI; 1.4, 12.1)), and increased height (for every additional 1 cm of height there was a serious neck injury OR of 1.08 (95% CI; 1.03, 1.14)). The latter two variables were not considered of importance for the question of interest

III. APPLICATIONS OF FORENSIC EPIDEMIOLOGY

Exhibit 4- 9

in the investigated case, as the counterfactual causation scenario only involved the theoretical reduction of roof crush and not the alteration of the roll arc side or height of the subject.

## Causation Conclusion

The results of the two studies described in the previous section can be used for a CRR estimate applicable for the circumstances of the investigated case, and as an indication that the risk of serious head and neck injury was 3.5−8.2 times greater given the observed roof crush of 10 inches (25 cm) in the crashed vehicle versus the alternative scenario of less than 6 inches (15 cm) of roof crush. Further, the results of the analysis indicated that the subject's failure to use the available seat belt was not causally related to his serious neck injury.

A CRR of 3.5−8.2 equates to an $AF_e$ of 71−88%, meaning that 71−88% of the cause of the serious neck injury observed in the subject occupant can be attributed to the observed excessive (>6 inches (15 cm)) roof crush. (See the conversion calculations based on the two CRR estimates below;

$$PC_{roof\ crush > 15\ cm} \approx \frac{(CRR - 1)}{CRR} \times 100\% = \frac{(3.5 - 1)}{3.5} \times 100\% = 71\%$$

$$PC_{roof\ crush > 15\ cm} \approx \frac{(CRR - 1)}{CRR} \times 100\% = \frac{(8.2 - 1)}{8.2} \times 100\% = 88\%$$

## CASE STUDY #3: SEAT BELT LATCH FAILURE-RELATED INJURY PATTERN RISK ANALYSIS

In the prior case study example, the disputed causal question of interest was "how much of the cause of the subject's serious neck injury would be eliminated if the roof crush had been less," and the answer was assessed using a counterfactual approach and quantified by the epidemiologic studies performed ad hoc for the investigation. In the following case study of an alleged seat belt latch failure, there was no dispute about an alternative or counterfactual scenario. The case involved a 16-year-old female driver of a 1999 Kia sedan who suffered fatal injuries following a rollover crash and subsequent ejection. Because of the ejection, the on-scene investigators concluded that the decedent had not been wearing her seat belt. Upon autopsy, however, the forensic pathologist noted a classic shoulder belt abrasion over the left shoulder, and as a result concluded that the decedent had indeed been using her seat belt at the time of the rollover crash, which was consistent with her history of customary use provided by her family (see Figs. 12.5 and 12.6 demonstrating the injury from autopsy photo and schematic of the orientation of the abrasion in the distribution of a driver's side shoulder belt).

Testing of the seat belt latching mechanism indicated that it was prone to a false latching scenario in which the latch plate makes a "clicking" sound when it is inserted into the receiver but does not completely latch, and thus can be unlatched with a relatively low load.

During the investigation, the question was raised as to whether the shoulder abrasion was a true seat belt abrasion, or whether it could also be explained by some other contact during

Exhibit 4- 10

Exhibit 5

**SUMMARY OF ERRATA CHANGES OF SHAWN PARCELLS**
**Wurm v. Ford Motor Company**
**No. 2:18-CV-2322**

| Page/Line | Original Testimony | Errata Change |
|---|---|---|
| 127/19 | Q.   Using your definition of occupant kinematics that you just testified to, are you going to be offering any opinions about Mr. Wurm's occupant kinematics during the course of the accident.<br><br>A.   Yes, I will.<br><br>Q.   Okay, and specifically what?<br><br>A.   The fact that his injuries are more consistent with as the car is rolling him -- as the car is rolling the roof crush coming down on him versus him going into the roof only because it would be my opinion that if he is actually going into the roof and suspended in space, that he would have more rotational type injuries because of the rollover where he doesn't have rotational type injuries, he's got axial load injuries. | Q.   Using your definition of occupant kinematics that you just testified to, are you going to be offering any opinions about Mr. Wurm's occupant kinematics during the course of the accident.<br><br>A.   Yes, I will.<br><br>Q.   Okay, and specifically what?<br><br>A.   The fact that his injuries are more consistent with as the car is rolling him -- as the car is rolling the roof crush coming down on him versus him going into the roof only because it would be my opinion that if he is actually going into the roof and suspended in space, that he would have more rotational type injuries because of the rollover where he doesn't have rotational type injuries, he's got axial load injuries. *For example, the flexion compression mechanism of injury to Mr. Wurm or in layman's terms 'his pattern of injury' was a result of the force of the roof crush to his spine while he was in a sitting position, and as depicted in Parcells' Exhibit 13 at page 166 while as an example in the Report of Ford's Expert Elizabeth H. Raphael, M.D., F.A.C.E.P. at page 11 of her 22-page Report of September 6, 2019 her description of the motorcycle injury was not consistent with Mr. Wurm's actual radiological findings because Dr. Raphael's example of mechanism of injury would not result in the pattern of injury of Mr. Wurm's experience based upon my education, training and experience, and from the recognized scientific literature in the field of spinal trauma stated in Parcells' Exhibit 13 as her motorcyclist example would have more likely than not have resulted in the motorcyclist experiencing anterior wedging to his thoracic spine radiological finding was not present in Mr. Wurm.*<br><br>*Reason: To provide proper meaning.* |

Exhibit 5- 1

| 146/7 | Q.   Okay, and we'll get into the injuries here in a little bit, but if Mr. Wurm was, actually was not wearing his seat belt at the time of the crash --<br><br>A.   Sure.<br><br>Q.   -- you would agree that would alter his kinematics inside the vehicle during the course of the event compared to what they would have been had ne been wearing his seat belt?<br><br>    Kjorlie: Object to the form, not proper foundation.<br><br>A.   I agree with that. | Q.   Okay, and we'll get into the injuries here in a little bit, but if Mr. Wurm was, actually was not wearing his seat belt at the time of the crash --<br><br>A.   Sure.<br><br>Q.   -- you would agree that would alter his kinematics inside the vehicle during the course of the event compared to what they would have been had ne been wearing his seat belt?<br><br>    Kjorlie: Object to the form, not proper foundation.<br><br>*A.*   I agree with that.  *However the kinematics of one wearing the seatbelt and not wearing a seatbelt in this case would be slight and would not have altered or changed Mr. Wurm's injuries to his spine because all the occupants in the truck stayed in their seats except the driver who was thrown from the truck which the literature supports as what would normally occur.  Also this fact I am now informed was testified to by all the occupants.*<br><br>    *Reason: To correct my testimony to accurately reflect fact.* |
| 147/5 | Q.   The next question is do you recall testimony from Mr. Wurm, from the excerpts that you looked at, where he indicated that he felt like he was flailing around, bouncing all around the truck during the course of the event?<br><br>A.   I remember that somewhere, yes. | Q.   The next question is do you recall testimony from Mr. Wurm, from the excerpts that you looked at, where he indicated that he felt like he was flailing around, bouncing all around the truck during the course of the event?<br><br>*A.*   ~~I remember that somewhere, yes.~~  *I have reviewed the facts after the deposition and there is no indication in in any of the deposition of the occupants to the truck material that Mr. Wurm "was flailing all about and bouncing around and in the truck during the rollover event" as represented by counsel.  I have reviewed Mr. Wurm's testimony and all of the occupants and this was never said by any of them.  Mr. Wurm testified that he remembers feeling suspended in space and feeling like dead weight when he experienced a sharp pain to his back.  All evidence is that all of the occupants other than the driver remained in their seats during the entire rollover event.*<br><br>    *Reason:  I was mistaken and relied upon a misstatement of counsel.  To correct my testimony to accurately reflect fact.* |

Exhibit 5- 2

| | | |
|---|---|---|
| 169/21 | Q.  All right.  Now, okay, we've talked a little bit about plaintiff's position inside the seat.<br><br>A.  Uh huh.<br><br>Q.  And I think what you told me is during the rollover portion of the event you would anticipate that Mr. Wurm's kinematics would have been basically pulling him down into the -- keeping him seated --<br><br>A.  Uh-huh.<br><br>Q.  -- and leaning inboard slightly?<br><br>A.  Most likely. | Q.  All right.  Now, okay, we've talked a little bit about plaintiff's position inside the seat.<br><br>A.  Uh huh.<br><br>Q.  And I think what you told me is during the rollover portion of the event you would anticipate that Mr. Wurm's kinematics would have been basically pulling him down into the -- keeping him seated --<br><br>A.  Uh-huh.<br><br>Q.  -- and leaning inboard slightly?<br><br>A.  ~~Most likely.~~ *I don't know if he was leaning or not, it would be sheer conjecture on my part.*<br><br>*Reason:  To accurately reflect fact.* |
| 176/2 | Q.  All right.  Can you tell me the -- what the timing is of those fractures?  In other words, which ones happened first, which ones happened kind of in the middle --<br><br>A.  Sure.<br><br>Q.  -- which ones happened toward the end?<br><br>A.  You know what, before I pull this out let me -- is there a piece of paper I can draw on, just a blank piece of paper?<br><br>Kjorlie:  One sheet?<br><br>Witness:  Yeah.  Thank you, Eric.<br><br>A.  So, our -- the anatomy of us, you know, is we're bipedal, homo sapiens, so, we walk on our, on our two feet instead of crawling.  Our spine's shaped differently than say a gorilla who also uses their hands and the unique thing about humans is that when you look at our vertebrae it's kind of a triangle.  So, here's the pelvis and here's the neck.  So, in other words, the triangle gets bigger as it goes from top to bottom and that's because whenever we walk gravity is constantly pulling at us and, so, we actually always have a constant axial, axial -- axial load. . . . So, the axial load on us as we're walking is always greater from -- it goes less to greater, okay, top to bottom.  So, in a, in a -- that's why our vertebrae get bigger as we come down 'cause the base of that triangle is the pelvis where the force is the greatest, believe it or not as we walk along.  So, in an accident situation that axial force is going to compress and that triangle also | Q.  All right.  Can you tell me the -- what the timing is of those fractures?  In other words, which ones happened first, which ones happened kind of in the middle --<br><br>A.  Sure.<br><br>Q.  -- which ones happened toward the end?<br><br>A.  You know what, before I pull this out let me -- is there a piece of paper I can draw on, just a blank piece of paper?<br><br>Kjorlie:  One sheet?<br><br>Witness:  Yeah.  Thank you, Eric.<br><br>A.  So, our -- the anatomy of us, you know, is we're bipedal, homo sapiens, so, we walk on our, on our two feet instead of crawling.  Our spine's shaped differently than say a gorilla who also uses their hands and the unique thing about humans is that when you look at our vertebrae it's kind of a triangle.  So, here's the pelvis and here's the neck.  So, in other words, the triangle gets bigger as it goes from top to bottom and that's because whenever we walk gravity is constantly pulling at us and, so, we actually always have a constant axial, axial -- axial load. . . . So, the axial load on us as we're walking is always greater from -- it goes less to greater, okay, top to bottom.  So, in a, in a -- that's why our vertebrae get bigger as we come down 'cause the base of that triangle is the pelvis where the force is the greatest, believe it or not as we walk along.  So, in an accident situation that axial force is going to compress and that triangle also |

Exhibit 5- 3

is there kind of to protect us in the fact that if we have increased axial loading the vertebrae's kind of designed -- like, in engineering you have -- my dad's a civil engineer, so, he explained to me the W shape in a, what's the guard -- guardrail, it's W shaped, if you look at the side like this, okay? So he was telling me actually just the other day that if you know a guardrail that has the square box on the end, they're designed to be hit and then that W compresses from a W out into a ribbon and that absorbs the force slowing the car down. This is kind of the same way that the forces are more absorbed as it goes along the vertebrae and thus that's why you don't see any cervical fractures because the force is transferred as it continues down and that's why you see the, more of the fractures along from the thoracic to the lumbar. My opinion is, is that the fractures occurred – you know, it's possible they could have occurred simultaneously.

---

is there kind of to protect us in the fact that if we have increased axial loading the vertebrae's kind of designed -- like, in engineering you have -- my dad's a civil engineer, so, he explained to me the W shape in a, what's the guard -- guardrail, it's W shaped, if you look at the side like this, okay? So he was telling me actually just the other day that if you know a guardrail that has the square box on the end, they're designed to be hit and then that W compresses from a W out into a ribbon and that absorbs the force slowing the car down. This is kind of the same way that the forces are more absorbed as it goes along the vertebrae and thus that's why you don't see any cervical fractures because the force is transferred as it continues down and that's why you see the, more of the fractures along from the thoracic to the lumbar *vertebrae because that is where the forces were the greatest*. My opinion is, is that the fractures occurred – you know, it's possible they could have occurred simultaneously.

*Reason: To provide proper meaning*

---

**179/17**

Q.    Okay, so, when -- is it your opinion that Mr. Wurm was being pulled down into his seat at the time the roof crushed and came down and struck him on top of the head?

A.    Yes, and I meant to -- I meant to say that when you look at the CT and MRI, he lost -- see, we all have curves. So, our neck is actually supposed to be curved this way and then the thoracic and then the lumbar goes the other way, so, we call this a lordotic curve. His neck was pretty much straightened up which tells me that it straightened up because these muscles that are along his spine had been injured in the accident and when they get injured they tighten up and thus they straighten his cervical vertebrae up versus having that curvature.

---

Q.    Okay, so, when -- is it your opinion that Mr. Wurm was being pulled down into his seat at the time the roof crushed and came down and struck him on top of the head?

A.    ~~Yes, and I meant to -- I meant to say that~~ *When the roof hit the ground, it remained stationary. However, as the truck was still on its top, the forces of hitting the ground means the ground caused a roof to crush into Mr. Wurm.* when you look at the CT and MRI, he lost -- see, we all have curves. So, our neck is actually supposed to be curved this way and then the thoracic and then the lumbar goes the other way, so, we call this a lordotic curve. His neck was pretty much straightened up which tells me that it straightened up because these muscles that are along his spine had been injured in the accident and when they get injured they tighten up and thus they straighten his cervical vertebrae up versus having that curvature.

*Reason: To provide proper meaning and better describe the forces of this stage of the event.*

Exhibit 5- 4

| 214/1 | Q.   [Reading from Parcells' Report] "Understanding that the medical literature has shown other case studies to prove that axial loading from rollover accidents cause compressive fractures, the risk ratio analysis would be above a 90 percent certainty for this type of injury experience by Mr. Wurm."  Did I read that correctly?<br><br>A.   Yes. | Q.   [Reading from Parcells' Report] "Understanding that the medical literature has shown other case studies to prove that axial loading from rollover accidents cause compressive fractures, the risk ratio analysis would be above a 90 percent certainty for this type of injury experience by Mr. Wurm."  Did I read that correctly?<br><br>A.   ~~Yes.~~ *No, the comparative risk ratio studies in Exhibit 25 on page 326 (attached) indicate that the risk of serious head-neck (spinal column) is 3.52-8.2 times greater in observed roof crush of 10 inches verses [sic] the alternative scenario of less than 6 inches. Furthermore, this same study and showed [sic] that the subject's failure to use the available seatbelt was no [sic] causally related to his spinal injury (see formula on page 326.*<br><br>*Reason:  To clarify the question asked by counsel.* |
| 275/5 | Q.   [By Kjorlie, discussing Parcells' report] There's something in here in that same paragraph, generally the level at which roof crush is considered to be associated with excess injury is when it exceeds six inches; do you see that?<br><br>A.   I do see that.<br><br>Ward: Objection.<br><br>Q.   And you went ahead and utilized this and made this a part of your report?<br><br>Ward: Object to the form.<br><br>A.   When I was initially writing my report my, my biggest theory that came from this was the difference between diving, in other words, that when the roof -- when the roof hits the ground the roof remains stationary and the occupant is moving towards the roof, versus the fact that when the roof hits the ground it remains stationary but the rest of the vehicle is still moving at a downward force causing that roof intrusion to come in and hit the occupant in the head.  All of my training in the sciences, including physics, tell me that even during the split second that the truck hit the ground before it ended up moving back over, that it makes sense that instead of Mr. Wurm going into the roof, which I don't think would have produced as much injury, versus as the roof coming towards | Q.   [By Kjorlie, discussing Parcells' report] There's something in here in that same paragraph, generally the level at which roof crush is considered to be associated with excess injury is when it exceeds six inches; do you see that?<br><br>A.   I do see that.<br><br>Ward: Objection.<br><br>Q.   And you went ahead and utilized this and made this a part of your report?<br><br>Ward: Object to the form.<br><br>A.   When I was initially writing my report my, my biggest theory that came from this was the difference between diving, in other words, that when the roof -- when the roof hits the ground the roof remains stationary and the occupant is moving towards the roof, versus the fact that when the roof hits the ground it remains stationary but the rest of the vehicle is still moving at a downward force causing that roof intrusion to come in and hit the occupant in the head.  All of my training in the sciences, including physics, tell me that even during the split second that the truck hit the ground before it ended up moving back over, that it makes sense that instead of Mr. Wurm going into the roof, which I don't think would have produced as much injury, versus as the roof coming towards |

Exhibit 5- 5

| | | |
|---|---|---|
| | him, but really that the truck and his bottom are still moving towards, causing the roof to come in and smack his head at a greater force than him diving into it. | him, but really that the truck and his bottom are still moving towards, causing the roof to come in and smack his head at a greater force than him diving into it.  *Attached to these corrections are omitted pages 325 and 326 of Parcells' Exhibit 25 (here attached to include the formula to substantiate that roof crush in excess of 6 inches occupants have a 71-88% chance of serious neck (spinal) injury directly caused by roof crush).*<br><br>*Reason:  This was inadvertently not included in the exhibit although I testified about it.* |
| 277/4 | [This correction is nonsensical; it appears to be an accidental duplication of the correction made at p. 178/4] | |
| 277/10 | Q.   Do you remember what description you used for the numerator and denominator as you sit here today?<br>A.   I believe it was injuries to the spine, numerator and denominator, axial forces, but the difference between studies that I reviewed about roof crush coming -- the roof -- well, the roof crushing into the occupant zone versus the occupant diving toward the roof. | Q.   Do you remember what description you used for the numerator and denominator as you sit here today?<br>A.   I believe it was injuries to the spine, numerator and denominator *(see formula on page 26 of Parcells' Exhibit 25)*, axial forces, but the difference between studies that I reviewed about roof crush coming -- the roof -- well, the roof crushing into the occupant zone versus the occupant diving toward the roof.<br><br>*Reason:  To clarify statement.* |
| | | |

Exhibit 5- 6

# Exhibit 6

BRITTANY MAE KERLEY
July 15, 2019

Page 85

```
 1    July 24, 2019
 2    Ms. Brittany Mae Kerley
 3    209 SW Terra Drive
 4    Topeka, KS  66609
 5    In Re:  MATHEW R. WURM vs. FORD MOTOR COMPANY, a
       Delaware corporation
 6
       Dear Ms. Kerley:
 7
       Please find enclosed a copy of your deposition
 8    taken on July 15, 2019, in the above-referenced
       case.  Also enclosed is the original signature page
 9    and errata sheets.
10    Please read your copy of the transcript, indicate
       any changes and/or corrections desired on the
11    errata sheets, and sign the signature page before a
       notary public.
12
       Please return the errata sheets and notarized
13    signature page to U.S. Legal Support,
       30800 Telegraph Road, Bingham Farms, MI 48025 for
14    filing prior to trial date.
15    Thank you for your attention to this matter.
16    Sincerely,
17
18    Vesta L. York, CSR, RMR, CRR
19    Enclosures
20    cc: Mr. Steven E. Ward
21
22
23
24
25
```

Exhibit 6- 1

BRITTANY MAE KERLEY
July 15, 2019

```
 1                  WITNESS ERRATA SHEET
 2      Witness Name:  BRITTANY MAE KERLEY
 3      Case Name:  MATHEW R. WURM vs. FORD MOTOR COMPANY,
 4      a Delaware corporation
 5
 6      Date Taken:  July 15, 2019
 7
 8      Page #_____   Line #_____
 9      Should Read: _____
10      Reason for Change: _____
11
12      Page #_____   Line #_____
13
        Should Read: _____
14
        Reason for Change: _____
15
16      Page #_____   Line #_____
17      Should Read: _____
18      Reason for Change: _____
19
        Page #_____   Line #_____
20
        Should Read: _____
21
        Reason for Change: _____
22
23
24      Witness Signature: _____
25
```


Exhibit 6- 2