# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

MATTHEW R. WURM,

    Plaintiff,

v.

FORD MOTOR COMPANY,

    Defendant.

Case No. 2:18-CV-02322-HLT

## MEMORANDUM AND ORDER

This is a product-liability case arising out of a rollover accident involving a Ford truck. Plaintiff Matthew Wurm was injured in the accident. He argues that a defect in the truck's roof caused his injuries when it collapsed during the rollover. He seeks more than $15,000,000 in damages. Defendant Ford Motor Company denies there was any defect in the truck's roof and argues that any injuries sustained by Wurm were the result of him not wearing his seatbelt.

Ford has filed several motions, including a motion to strike deposition errata sheets (Doc. 70), two *Daubert* motions to exclude the testimony of Wurm's experts (Docs. 68 and 72), a motion for summary judgment (Doc. 76), and a motion for sanctions regarding spoliation of evidence (Doc. 74). Because the deposition errata sheets were improper under Rule 30(e), the Court grants the motion to strike. The Court also grants the two *Daubert* motions and excludes Wurm's experts because neither is qualified to render his opinions. Because Wurm relies exclusively on his experts to defeat summary judgment, their exclusion renders summary judgment appropriate, and the Court grants that motion as well. Finally, because the only relief sought in the motion for sanctions has been granted on the other motions, the Court denies that motion without prejudice as moot.

**I.     BACKGROUND**[1]

This case arises from a single-vehicle accident involving a 1999 Ford F-250 Super Duty pickup truck. Doc. 66 at 2. Wurm was one of five passengers in the truck and was not the truck's owner. *Id.* None of the other passengers are parties to this case. The driver of the truck was driving in excess of the speed limit on a gravel road at approximately 1:30 a.m. on June 18, 2016. *Id.* The driver lost control of the truck, and it left the road, traveled up an embankment, and went into a passenger-side leaning roll. *Id.* It came to a rest on its wheels on the other side of the road. *Id.*

Wurm was in the backseat of the truck's cab and alleges he sustained multiple spinal fractures when his body came into contact with the collapsed roof of the truck. *Id.* at 7. He claims his injuries are permanent and cause daily pain that restrict his ability to enjoy an active lifestyle. *Id.* Wurm also disputes Ford's contention that he was not wearing a seatbelt because EMTs at the scene reported that he was wearing a seatbelt at the time of the crash. *Id.* at 8. He contends that the truck's roof had a latent design defect, which caused the roof to crush inward, and that Ford knew about the design defect. *Id.* at 7-8. Wurm's claims are based on strict liability, including that Ford failed to incorporate a safe design, failed to use sufficiently strong materials in the truck's roof, and failed to adequately warn of the latent dangers in the roof. *Id.* at 10.

Ford argues that Wurm's injuries were not caused by "roof crush" and were instead the result of the driver's negligence or Wurm's own negligence because he was either riding in the back of the truck or was unbuckled inside the cab. *Id.* at 9. Any injuries Wurm sustained, which Ford maintains are not as significant as Wurm claims, were caused by him "diving" onto the roof and were not the result of any design defect in the truck. *Id.* at 9-11. Ford further argues that the truck was not defective and that it met all applicable specifications and standards. *Id.*

---

[1]    The following background is taken from the pretrial order, including stipulated facts. *See* Doc. 66.

## II. ANALYSIS

### A. Motion to Strike

Ford moves to strike two deposition errata sheets submitted by Shawn Parcells and Brittany Kerley. Rule 30(e) governs deposition errata sheets. That rule allows a deponent to review the transcript and "if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them." Fed. R. Civ. P. 30(e)(1). The changes must be submitted within 30 days after the transcript or recording is available. *Id.* The 30-day rule is "mandatory." *Cappell v. Dep't of Army, Sec.*, 2014 WL 5782389, at *1 (D. Kan. 2014). Changes outside that window are not allowed. *See id.*

The Tenth Circuit takes "a dim view" of substantive changes to deposition testimony made under Rule 30(e). *BancFirst ex rel. Estate of M.J.H. v. Ford Motor Co.*, 422 F. App'x 663, 666 (10th Cir. 2011); *see also Summerhouse v. HCA Health Servs. of Kan.*, 216 F.R.D. 502, 505 (D. Kan. 2003) ("Kansas appears to be one of the federal districts tending toward the more restrictive view of Rule 30(e)."). Under the more restrictive view, "Rule 30(e) only permits correcting transcription errors; therefore, it does not authorize changes because the deponent lied, misspoke, or otherwise wants to change or clarify his testimony." *Summerhouse*, 216 F.R.D. at 505.

The threshold question in evaluating errata changes is whether the changes are material. *See id.* at 508. If a change is material—that is bearing on an essential element of a claim or defense—it is only allowed if it passes the so-called *Burns* test. *Id.*; *Cargill Meat Sols. Corp. v. Premium Beef Feeders, LLC*, 2015 WL 5821696, at *1-*2 (D. Kan. 2015). In *Burns v. Board of County Commissioners*, the Tenth Circuit held that Rule 30(e) changes should be evaluated under the same factors used to evaluate whether an affidavit is a sham affidavit. *Burns v. Bd. of Cty. Comm'rs of Jackson Cty.*, 330 F.3d 1275, 1282 (10th Cir. 2003). Those factors are (1) whether the

person was cross-examined, (2) whether the corrections are based on newly discovered evidence; and (3) whether the corrections are aimed at obvious confusion, as opposed to indecisiveness or inconsistent deposition testimony. *See id.*; *see also Cargill*, 2015 WL 5821696, at *1. This same standard applies regardless of whether there is a summary-judgment motion pending. *Summerhouse*, 216 F.R.D. at 507.

Under these standards, Kerley's errata sheet is untimely. As Ford notes, the court reporter sent Kerley her transcript on July 24, 2019. Doc. 71-1 at 80. Kerley did not return her changes until December 2, 2019—well outside the 30 days permitted by Rule 30(e). *See id.* at 11. Wurm admits the changes were untimely but states that the changes nevertheless "are believed to be consistent with the testimony of the medical EMT or the Plaintiff's testimony to corroborate this'az [sic]."[2] Doc. 88 at 3. But the 30-day time period is "mandatory," *Cappell*, 2014 WL 5782389, at *1, and even timely changes are not permitted under *Burns* just because a party seeks to have the testimony changed to match other evidence. As is frequently noted, "A deposition is not a take home examination." *Greenway v. Int'l Paper Co.*, 144 F.R.D. 322, 325 (W.D. La. 1992); *see also Cargill*, 2015 WL 5821696 at *1 (noting *Greenway*'s "oft-repeated passage").

Ford does not contend that Parcells's errata sheet was untimely, but it argues the changes violate the *Burns* standard. The changes are detailed in an exhibit to Ford's motion and are too lengthy to repeat here. *See* Doc. 71-1 at 73-78. Suffice it to say that the changes are substantial, substantive, and in places add entire paragraphs to answers. *See, e.g.*, *id.* at 73-74. One change seeks to delete a one-word "Yes" answer and replace it with an entire paragraph beginning with

---

[2] Kerley originally answered "Correct," when asked, "And then -- but none of the three occupants, including yourself, in the backseat, were wearing your seat belts, correct?" Doc. 71-1 at 4. Kerley's untimely errata sheet sought to delete the word "Correct" and change her answer to "I just assumed that the other two occupants in the back seat, Mathew Wurm [sic] and William Pagan were not wearing their seatbelts; but I have no independent knowledge to state that either they were, or that they were not, wearing their seatbelts." *Id.* at 11.

4

"No." *Id.* at 77. Another changes "Most likely" to "I don't know." *Id.* at 75. Other changes were made after having time to reflect and review evidence after the deposition. *Id.* at 74.

Wurm makes almost no effort to defend these changes, other than arguing incorrectly that Kansas follows a generous approach in allowing Rule 30(e) changes—something contradicted by the law cited above.[3] Under those applicable standards, the Court concludes the changes are not appropriate. Arguably, because Wurm relies on Parcells to establish causation, his testimony is material to a key issue in the case. But Wurm's counsel had the opportunity to cross-examine Parcells at his deposition. Indeed, some of the changes appear to be to answers in response to Wurm's counsel. *See* Doc. 71-1 at 77-78. Nor has the Court discerned any need to correct confusion.[4]

One change was made to address an expert report provided by Ford after Parcells's deposition. *See* Doc. 71-1 at 73 (referencing the September 6, 2019 report of Ford expert Elizabeth H. Raphael). But this change does not reflect a need to address newly discovered evidence. It is merely an ad hoc rebuttal to that expert inserted into deposition testimony. To the extent Parcells wanted to provide a rebuttal to that report, the assigned magistrate judge had set a deadline to do so. Doc. 46 at 2. That he failed to do so does not given him license to alter his deposition testimony. Accordingly, Ford's motion to strike the deposition errata sheets of Kerley and Parcells is granted.

---

[3] Although citing almost no law, Wurm's response suggests that Ford misinterprets the law regarding Rule 30(e), stating that "Our former Chief Judge Kathryn H. Vratil has determined that it is of the right of the deponent under Rule 30(e) to make changes to a deposition via Errata Sheets to include changes to what the deponent meant, to clarify responses, or even to make contradictions to the deponent's deposition testimony." Doc. 88 at 3. But Wurm cites no authority for this statement, and the Court has found none for it. To the contrary, other decisions in the district have found precisely the opposite. *See Summerhouse*, 216 F.R.D. at 506 (noting that Judge Vratil's statements in dicta about the limited purpose of Rule 30(e) "give[s] considerable insight into how Rule 30(e) is viewed within the district").

[4] Although some of Parcells's changes are offered to "clarify," *see* Doc. 71-1 at 77-78, his failure to clearly answer the question or provide thorough answers in the moment does not meet the third factor of the *Burns* test. *See Summerhouse*, 216 F.R.D. at 505 (noting that, under *Greenway*, "Rule 30(e) only permits correcting transcription errors; therefore, it does not authorize changes because the deponent lied, misspoke, or otherwise wants to change or clarify his testimony," and that Kansas leans towards this more restrictive view).

## B. *Daubert* Motions

Ford moves to exclude the expert testimony of both of Wurm's experts: Parcells, retained to testify about the causation of Wurm's injuries (Doc. 68), and David McLellan, Wurm's expert regarding the design and performance of the allegedly defective truck roof (Doc. 72). For both experts, Ford argues that (1) they are not qualified to render their opinions and (2) the opinions are not reliable.

### 1. Standard

Federal Rule of Evidence 702 governs expert testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Rule 702 imposes upon the district court a "gatekeeping role" to ensure that expert testimony is both relevant and reliable. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589, 597 (1993); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999).

In performing this gatekeeping function, the "the district court generally must first determine whether the expert is qualified 'by knowledge, skill, experience, training, or education' to render an opinion." *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (quoting Fed. R. Evid. 702). Second, if the expert is qualified, the court next determines if the expert's

opinion is reliable under *Daubert*. *Id.* The burden is on the party offering the expert testimony to prove its admissibility. *Id.* "A district court has 'wide discretion' in determining whether a witness's experience is sufficient to qualify him as an expert." *Ronwin v. Bayer Corp.*, 332 F. App'x 508, 512-13 (10th Cir. 2009).

### 2. Shawn Parcells

Ford argues that Parcells is not qualified to offer expert testimony regarding causation of Wurm's injuries (biomechanics),[5] Wurm's movements in the truck during the accident (occupant kinematics),[6] or the relative risk of injuries to occupants during automobile accidents (epidemiology), and that Parcells's opinions are highly unreliable under Rule 702 and *Daubert* and *Kumho Tire*. Doc. 69 at 1.

#### a. Parcells's Report

Parcells's expert report states that Wurm's spinal injuries were caused by axial loading that occurred when his body came into contact "with the crushed roof of the vehicle." Doc. 69-2 at 93-96. Although not included as an opinion in his report, in his deposition Parcells stated that Wurm's injuries resulted from the roof "crushing" onto Wurm as opposed to Wurm "diving" into the roof. *Id.* at 68-69. Parcells's reasoning for that conclusion is that the forces acting on Wurm during the accident would not have permitted Wurm to come into contact with the roof ("diving") before the roof came into contact with Wurm ("crushing"), although Parcells acknowledged that "diving" was a possibility given that Wurm has admitted not wearing a seatbelt. *Id.* at 68, 71-73.[7] Parcells

---

[5] "Biomechanics is 'the study of the action of external and internal forces on the living body, especially on the skeletal system.'" *Tuato v. Brown*, 85 F. App'x 674, 677 n.3 (10th Cir. 2003) (quoting *Random House Unabridged Dictionary* 210 (2d ed.1993)); *see also Hoffman v. Ford Motor Co.*, 493 F. App'x 962, 979 (10th Cir. 2012) (defining biomechanics as "the study of how the human body moves in response to forces").

[6] Kinematics refers to occupant motion. *See Harvey By & Through Harvey v. Gen. Motors Corp.*, 873 F.2d 1343, 1355 (10th Cir. 1989).

[7] Wurm maintains that whether he was wearing a seatbelt is a disputed fact because EMT reports reflect that Wurm told them he was wearing a seatbelt. Doc. 66 at 8. Wurm and others later testified or stated that Wurm was not

7

believes Wurm would have remained in a normal seated position throughout the course of the accident, during which the truck swerved, crossed a ditch, and hit an embankment before rolling. *Id.* at 54-55, 71-73. And in Parcells's view, "diving" onto the roof alone would not have generated enough force to cause Wurm's injuries. *Id.* at 72-73. The distinction is significant because Wurm's claim against Ford is based on a design defect in the roof, and Ford can only be liable if the defect caused Wurm's injuries (in other words, that a defective roof "crushed" in on him instead of him "diving" into the roof as a result of being unbuckled during the accident).

### b. Parcells's Qualifications

The Court's first gatekeeping role is to determine whether Parcells has the "knowledge, skill, experience, training, or education" to qualify him as an expert on the issue of what caused Wurm's injuries. *See* Fed. R. Evid. 702; *Nacchio*, 555 F.3d at 1241. "Proposed expert testimony must therefore 'fall within the reasonable confines of [the witness's] expertise.'" *Taber v. Allied Waste Sys., Inc.*, 642 F. App'x 801, 807 (10th Cir. 2016) (quoting *Conroy v. Vilsack*, 707 F.3d 1163, 1169 (10th Cir. 2013)). A court has "wide discretion" on this issue. *Ronwin*, 332 F. App'x at 512-13.

Parcells has a bachelor's degree in life science. Doc. 69-2 at 22. He also has a master's degree of science in anatomy and physiology instruction in a program that emphasizes instruction of those topics. *Id.* at 22-24. Although at one point he was pursuing a public-health degree with an emphasis in epidemiology, that program was discontinued and he did not complete it and has not been conferred the degree. *Id.* at 31-32; *see also id.* at 98 (resume stating "DrPH Program") and 89 (transcript reflecting completion of only 36 hours of coursework). He is not a doctor,

---

wearing a seatbelt. *See, e.g.*, Doc. 73-2 at 7 (Wurm deposition); *id.* at 19 (affidavit of Wurm); *see also supra* note 2.

chiropractor, or engineer. *Id.* at 40-41. He holds no professional licenses, *id.* at 42, and has never been published, *id.* at 76. His primary experience is in conducting autopsies as a pathology assistant. *Id.* at 77; *see also id.* at 98.[8] He has limited experience in analyzing injuries in rollover crashes and could only recall one case he worked on involving the causation of spinal injuries, though those facts were quite distinct from the instant case. *Id.* at 27-30.

At his deposition, he stated he would be testifying about occupant kinematics, including about how Wurm moved during the accident and was injured as a result. *Id.* at 46. But he is not qualified to offer that testimony, as he has no education, knowledge, or relevant experience in that field. Parcells also testified that "[i]n some regards, yes," he holds himself out as a biomechanical expert. *Id.* at 41-42. But that was based on work he has done opining about spine and brain injuries in shaken-baby cases. *Id.* Even if such work did qualify him as a biomechanics expert in those type of cases, it in no way qualifies him as a biomechanics expert in this wholly factually distinct case. *See Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 (10th Cir. 2001) ("[M]erely possessing a medical degree is not sufficient to permit a physician to testify concerning any medical-related issue."); *Delgado v. Unruh*, 2017 WL 957437, at *19 (D. Kan. 2017) (finding that a chiropractor with no training in biomechanics or kinematic studies is not qualified to testify about the forces involved in a crash or the type of bodily injuries that would or would not result based on the mechanical forces generated).

---

[8] Parcells has recently been the subject of criminal and civil investigations by the state of Kansas. In 2019, a temporary restraining order was issued barring him from representing that he has education or training in the healing arts, including as a doctor, physician, pathologist, physician assistant, or professor. Doc. 69-2 at 112-18. In that case, the Kansas Attorney General brought claims against Parcells and his various autopsy and pathology companies under the Kansas Consumer Protection Act and the Kansas False Claims Act. *Id.* Criminal charges have also been brought against him in Wabaunsee County, Kansas, related to him performing autopsies. *Id.* at 43. In at least the civil case, Parcells is personally represented by Wurm's attorney, as suggested by some emails attached by Wurm to some of the briefing, *see* Doc. 82-13 (correspondence between Wurm's attorney on behalf of Parcells and Kansas Attorney General officials regarding turning over tissue samples in Parcells's possession, purportedly related to the civil action), and confirmed through the Shawnee County District Court's public records.

In response to the persuasive arguments advanced by Ford regarding Parcells's lack of expertise in the areas he seeks to testify, Wurm has failed to carry his burden in establishing that Parcells is qualified to render his opinion in this case. *See Hoffman*, 493 F. App'x at 974 (noting that it is a proponent's burden to show that expert testimony is reliable and relevant, rather than opponent's duty to demonstrate that the opinion is unreliable or irrelevant). All Wurm points to is Parcells's experience in anatomy and "radiological anatomy" based on his education and experience as a pathologist assistant. Doc. 82 at 6. Although Parcells's experience as an anatomist may give him expertise in that field,[9] it in no way qualifies him to opine on the cause of Wurm's injuries, which is a question of biomechanics and occupant kinematics. The Court notes that other courts have likewise rejected Parcells's attempt to testify in a specialized field based solely on his limited experience in anatomy or forensic pathology. *See City of Topeka v. Lauck*, 2017 WL 4216191, at *4 (Kan. Ct. App. 2017) (applying federal *Daubert* standards and concluding that Parcells's work in forensic pathology did not qualify him to testify that a defendant's asthma artificially inflated the results of a breathalyzer test, which required specialized expertise).

Wurm also attempts to bolster Parcells's credibility by citing to two texts—neither of which are listed in Parcells's expert report as references relied on—and arguing that the texts' "scientifically recognized facts . . . should it is respectfully submitted permit [Parcells] in the Court's due discretion to testify as a forensic scientist these facts on behalf of the Plaintiff at Jury Trial." Doc. 82 at 3-4. As best the Court can decipher, it appears that Wurm is arguing that, because Parcells's conclusion is at least consistent with some statements in these texts or treatises, he

---

[9] To be clear, although it is not at issue, the Court does not find that Parcells is qualified even to that extent. And certainly, whether he is able to opine "with a reasonable degree of medical certainty," as his report states, Doc. 69-2 at 94, seems dubious given his qualifications.

should be allowed to testify. But that does not demonstrate that Parcells is <u>qualified</u> to reach that conclusion in the first place.[10]

In sum, Wurm has failed to carry his burden of establishing that Parcells is qualified to offer his proposed opinions. Allowing Parcells to testify under these circumstances would be a complete abdication of the Court's gatekeeping role under Rule 702 and *Daubert*. Accordingly, the Court grants Ford's motion (Doc. 68) and excludes Parcells's testimony.[11]

### 3. David McLellan

Ford also moves to exclude McLellan, Wurm's expert on whether the truck's roof had a design defect. Doc. 72. Specifically, Ford argues that the testimony of Wurm's expert David McLellan should be excluded because he is not qualified to offer testimony about biomechanics, occupant kinematics, or occupant protection in rollover accidents, nor is he qualified to testify about the design or performance of the truck's roof. Doc. 73 at 3. Ford also argues that McLellan's opinions are unreliable under Rule 702.

#### a. McLellan's Report

McLellan submitted a supplemental preliminary report on July 10, 2019. *See* Doc. 73-2 at 48-64.[12] In his report, McLellan referenced a 2005 Exponent Roof Crust Test involving a later

---

[10] Wurm also states in his response that Parcells's deposition errata changes offer rebuttal to one of Ford's experts. Doc. 82 at 7. But the Court has already concluded that those errata changes were improper under Rule 30(e) and does not consider them. Even if it did, however, those changes in no way demonstrate Parcells's qualifications.

[11] Because the Court finds Parcells is not qualified to offer expert testimony in this case, it does not reach Ford's other arguments regarding the reliability of Parcells's testimony. *See* Doc. 69 at 10-16. But the Court does note that, at a minimum, it has serious concerns about the reliability of his opinions given that they are not based on any accident reconstruction. Parcells testified in his deposition that, during the other parts of the accident (including the possibility that the truck traversed a ditch, struck a rock wall, and hit a pole before rolling), Wurm would have remained in a normal seated position because of "simple physics." *See* Doc. 69-2 at 53-63. But Parcells acknowledged that, without knowing how the truck struck the pole, it is difficult to assess Wurm's kinematics during the accident. *Id.* at 55.

[12] An earlier version of McLellan's report was produced on June 21, 2019. *See* Doc. 78-3. It appears that the supplemental report produced later simply added material to the earlier report and was slightly reformatted. Thus, the Court relies primarily on the supplemental report as inclusive of all of McLellan's opinions.

model Ford F-250 truck that had the same truck design, though it had a longer cab than the truck involved in this case. *Id.* at 56. In that test, a horizontal plate was driven downward onto the roof of the truck, which was rigidly supported from below. *Id.* During that test, the truck roof collapsed in a V shape as the plate load reached peak load. Although McLellan's report states "It was now evident why the roof buckled downward in the middle in a V shape," his report does not further explain how it was evident, other than to note that the rear roof cross body beam failed. *See id.* at 57-59. McLellan includes pictures from the Exponent test and pictures of the truck in this case, noting a similar V-shaped collapse. *Id.* at 59. McLellan then discusses schematics of the F-250 and notes that a cargo lamp is placed in the same location where the V-shaped collapse occurred, and that the reinforcement in that area is adhesively bonded. *Id.* at 61. Although McLellan does not note whether that is improper from an engineering standpoint, he does note that the V-shaped collapse happened in that same spot. *Id.* at 62. McLellan concludes by stating that the V-shaped collapse "should have been caught in testing," and that Ford was aware of the Exponent test and was therefore aware of "the rear center roof bow's weakness" by late 2005. *Id.* at 64.

In his conclusion, McLellan also opined on the effect of the accident on the occupants of the truck:

> You can imagine the occupants who are constrained only by gravity sitting on their seat now experiencing multiple directions of vehicle rotation around them. They are in the dark, probably disoriented. I have no expectation that they were more than inertial bodies subject to being damaged by interior surfaces that collided with them. This is compounded by the V collapse of the rear portion of the roof. It would be extremely unfortunate to be under the V as it abruptly collapses. That the three rear passengers sustained injury attests to the violence of the event.

*Id.* at 63. As Ford notes, McLellan's opinion thus addresses two areas: the impact of the accident on the occupants of the truck, and the design and performance of the truck's roof.

### b. McLellan's Qualifications as to Occupant Injuries and Causation

As explained above, the Court must first determine whether McLellan has the "knowledge, skill, experience, training, or education" to qualify him as an expert on the issues he plans to testify about. *See* Fed. R. Evid. 702; *Nacchio*, 555 F.3d at 1241. A court has "wide discretion" on this issue. *Ronwin*, 332 F. App'x at 512-13.

To the extent McLellan intends to offer an expert opinion about the occupants' movement within the truck and how they interacted with the truck during the accident, the Court agrees with Ford that that statement requires expertise in biomechanics, occupant kinematics, and occupant protection in rollover accidents, which is beyond McLellan's expertise. *See* Doc. 73 at 4-7. McLellan acknowledged as much when he testified that whether Wurm's injuries were caused by either "diving" or "crushing" is outside the scope of his opinion, and that he is "not a forensic engineer" or "a forensic person that looks at injury and makes sense out of it." *Id.* at 88-90; *see also id.* at 129 (previous deposition of McLellan in another case stating he is not a "biomechanic"). Accordingly, the Court excludes the portion of McLellan's report where he opines on occupant movement, injury, or causation.

### c. McLellan's Qualifications as to Truck Design and Performance

Ford also argues that McLellan lacks qualifications to offer opinions regarding the design and performance of the truck's roof. Doc. 73 at 7-11. McLellan is a mechanical engineer. Doc. 73-2 at 49, 72. He retired in 1992 after working for General Motors for 33 years, first doing engineering and testing at the Milford Proving Ground, and then as chief engineer for the Corvette. *Id.* at 49, 72-74, 124. As chief engineer, he oversaw staff engineers who were tasked with design in their respective areas. *Id.* at 79, 104. But he never worked on roof structures as a design engineer, *id.* at 104, and has never been involved with truck design, *id.* at 113. Although his work involved

vehicle testing, he was never involved with any intentional rollover tests to evaluate roof structures. *Id.* at 80.[13] However, there was one test involving a Camaro where the vehicle inadvertently rolled over. *Id.* at 75. McLellan testified that he has no knowledge of F-250 design criteria or roof strength compared to competitor vehicles. *Id.* at 83. He also testified he does not know whether Ford ever tested the F-250 roof for crush strength, or whether Ford violated any written standards, rules, codes, regulations, or statutes in the design of the 1999 F-250. *Id.* at 110, 114-15. McLellan also testified that his report was not based on any accident reconstruction. *Id.* at 99, 117.

Although there is no doubt McLellan has experience in car design and engineering, it is far from clear that his experience, which primarily was as chief engineer for the Corvette, renders him qualified to testify about design defects in a Ford F-250 truck roof. The Tenth Circuit has cautioned that "merely possessing a medical degree is not sufficient to permit a physician to testify concerning any medical-related issue." *Ralston*, 275 F.3d at 970. The same analogy holds in this context.

Although McLellan has plenty of experience in car engineering <u>generally</u>, there are obvious design differences and performance demands between a heavy-duty truck and a sports car that simply make his experience a mismatch for this case. "The Court is charged with determining whether the testimony is within the reasonable confines of the expert's subject area." *Delgado*, 2017 WL 957437, at *19 n.59 (citing *Ralston*, 275 F.3d at 970). Here, the Court finds that

---

[13] On this point, the Court notes a signed document submitted by McLellan to "amplify" his CV. Doc. 73-2 at 131-32. Contrary to his deposition testimony where he could only recall one handling test that involved an accidental rollover, *id.* at 74-75, 80, the document says he was involved in "all manner of handling tests including roll overs" during his time at the GM Providing Ground. *Id.* at 131. The Court notes that this document is labeled as "declaration," but it is neither notarized nor executed under penalty of perjury. In other words, it is an unsworn statement made in contradiction of McLellan's sworn testimony. The Court therefore does not consider it persuasive.

McLellan's experience is simply not sufficiently relevant to the issues in this case to render him qualified to offer his proposed opinions. *See Ho v. Michelin N. Am., Inc.*, 520 F. App'x 658, 663 (10th Cir. 2013) (finding no error in excluding an expert who failed to tie general experience in the tire industry to the specific opinions advanced in the case).

In response to Ford's motion, Wurm falls back on McLellan's experience in the automotive industry to argue he is qualified to opine in this case. *See* Doc. 85-13 at 4-6. But this fails to address Ford's argument that McLellan's general experience does not make him qualified to testify about the design and performance of the Ford F-250 truck in this case. The Court does not necessarily conclude that someone with McLellan's experience would never be qualified to testify on a particular issue of vehicle design defect. But in merely reciting McLellan's resume, experience, and accolades, Wurm has failed to carry his burden of demonstrating that McLellan's opinions are within the confines of his area of expertise in this particular case. *See Delgado*, 2017 WL 957437, at *19 n.59. Accordingly, the Court excludes McLellan's testimony regarding truck design and performance.

### d. Reliability of McLellan's Opinion on Truck Design

Even if the Court concluded McLellan's engineering background and education and work experience in the automotive industry qualified him to opine on whether the truck at issue had a design defect, it would still need to assess his proposed testimony for reliability under the principles set forth in *Daubert*. *Ralston*, 275 F.3d at 969. Reliability turns on "whether the reasoning or methodology underlying the testimony is scientifically valid." *Taber*, 642 F. App'x at 808 (quoting *Daubert*, 509 U.S. at 592-93). A court has wide discretion to consider a variety of factors in evaluating reliability. *Rodgers v. Beechcraft Corp.*, 759 F. App'x 646, 659 (10th Cir. 2018). A key inquiry is whether the proposed testimony is based on sufficient facts and data. *Id.*

15

at 657. Ultimately, a court must consider whether the testimony "fits" and would aid the jury in resolving a factual dispute. *Hoffman*, 493 F. App'x at 973.

The focus in this analysis is on the methodology employed, not the conclusions reached. *Taber*, 642 F. App'x at 808. Where the conclusion does not follow from the data, a court can determined that "an impermissible analytical gap exists between premises and conclusion." *Id.* (quoting *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1233 (10th Cir. 2005)); *see also Rodgers*, 759 F. App'x at 658 (noting a court need not admit opinion evidence connected to the data through only the ipse dixit of the expert). As with expert qualifications, the burden of establishing the reliability of an expert's testimony is on the party offering it. *See Nacchio*, 555 F.3d at 1241.

McLellan's proffered opinion appears to be that the collapse of the truck's roof in a V shape like what was seen in the Exponent test is indicative of a design defect. But, importantly, he fails to explain why. It is not even clear that the Exponent test results reflect any design defect from which comparisons could be drawn to this case.[14] He simply compares the collapsed roof in this case to the Exponent case and concludes that Ford should have caught the possibility of a V-shaped collapse in testing. Doc. 73-2 at 64. But that fails to establish a design defect. Further, as Ford points out, McLellan testified he has "no way of knowing" the forces involved on the truck during the rollover and merely assumed that the forces on the truck in this case were similar or less than those in the Exponent test. *Id.* at 93-94.[15] The Exponent test also involved a truck with a differently designed cab. *Id.* at 96. Given that, it is unclear how McLellan can draw any conclusions or comparisons to the Exponent test.

---

[14] Ford argues that the purpose of the Exponent test was to measure the resistance of the vehicle's roof as the plate moved downward a total of 15 inches, suggesting that the roof's collapse was not an indication of failure, but rather the intended result of the test. Doc. 73 at 18. Wurm offers no additional explanation of the significance or purpose of the test or how it suggests a design defect in the truck he was riding in.

[15] McLellan did not do any accident reconstruction. Doc. 73-2 at 117. He did review crash-site photographs to see if any obstacle like a boulder could have caused the V-shaped collapse but did not see anything. *Id.* at 55.

McLellan also notes that the reinforcement across the back roof beam was adhesive bonded, and a cargo lamp was placed right in the center of the roof at the location where it collapsed. *Id.* at 61. But he also notes that the schematics he cites "may not represent the final structural details of the production truck." *Id.* at 62. Nor does he argue that any of this reflects a design defect—he only notes that "the cross bow did fail and it failed at the location of the cargo lamp." *Id.* He offers no independent testing, evaluations, or calculations to suggest this is a design defect. To the extent he is claiming that this is a design defect, the Court notes that McLellan testified that he has no knowledge of F-250 design criteria or roof strength compared to competitor vehicles. *Id.* at 83. He also testified he does not know whether Ford ever tested the F-250 roof for crush strength, or whether Ford violated any written standards, rules, codes, regulations, or statutes in the design of the 1999 F-250. *Id.* at 114-15. This undercuts the reliability of his proffered opinion.

If any step in an expert's methodology renders the expert's analysis unreliable, it also renders the testimony inadmissible. *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 782 (10th Cir. 1999). Here, all that Wurm has shown is McLellan's opinion that the roof is defective, without any scientific support. "Experience is not necessarily a password to admissibility, and neither the district court nor this court will connect the dots on behalf of a litigant." *Ho*, 520 F. App'x at 665. Nor is a court required to admit testimony based solely on the say-so of an expert. *See Rodgers*, 759 F. App'x at 658. Accordingly, even if the Court concluded McLellan was qualified in this instance, it would still conclude that his testimony is inadmissible. Ford's motion to exclude McLellan's testimony is granted.

### C. Motion for Summary Judgment

#### 1. Standard

Summary judgment is appropriate if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant to demonstrate that genuine issues remain for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

#### 2. Analysis

Wurm asserts three strict-liability claims in the pretrial order: (1) failure to incorporate a safe design of the roof and pillar supports to prevent roof crush; (2) failure to incorporate a safe design through use of product materials with a greater strength or rigidity; and (3) failure to adequately warn of latent dangers likely to cause serious injury or death. Doc. 66 at 10.

A defective-products claim has three elements: "(1) the injury resulted from a condition of the product; (2) the condition was an unreasonably dangerous one; and (3) the condition existed at the time it left the defendant's control." *Samarah v. Danek Med., Inc.*, 70 F. Supp. 2d 1196, 1202 (D. Kan. 1999) (quoting *Jenkins v. Amchem Products, Inc.*, 886 P.2d 869, 886 (Kan. 1994)). For all products-liability claims in Kansas, regardless of the theory of relief, a plaintiff must prove that a defect in the product caused his injury. *Voelkel v. Gen. Motors Corp.*, 846 F. Supp. 1468, 1475 (D. Kan. 1994); *see also Rodgers*, 759 F. App'x at 676.

Ford largely incorporates its *Daubert* arguments in arguing that Wurm cannot prevail at trial because he cannot offer any reliable testimony that the truck was defective and that any alleged defect caused his injuries. Doc. 77 at 9-10. Ford also argues that expert testimony is required in

this case because the subject matter is sufficiently complex to be beyond the knowledge of a common layperson. *Id.* at 15.

The test for whether expert testimony is required under Kansas law is whether the subject matter is complex and beyond the common knowledge of the jury. *Estate of Betty Lou McDermed v. Ford Motor Co.*, 2016 WL 4142107, at *3 (D. Kan. 2016); *Ho*, 520 F. App'x at 667. Wurm acknowledges that the topics in this case "require special knowledge, training, and experience" in the form of his experts' opinions and that the experts Ford "wishes to exclude our [sic] integral to any possibility of recovery for the damages sustained due to the products failure" and that this case is a "war between experts." Doc. 86 at 2, 4.

Here, the Court has excluded both of Wurm's experts—experts he admits are necessary to his case. Without experts, Wurm has no evidence of causation of his injuries, a design defect in the truck, any latent danger in the truck, or the adequacy or lack thereof of any warnings.[16] Based on this, the Court finds Ford is entitled to summary judgment on all claims.[17]

---

[16] Ford alternatively argues it is entitled to summary judgment on Wurm's failure-to-warn claim on separate grounds. Doc. 77 at 18-20. Because all product-liability cases in Kansas, including those based on a failure to warn, require evidence that a design defect caused the plaintiff's injuries, *Voelkel*, 846 F. Supp. at 1475; *Ho*, 520 F. App'x at 668, and because Wurm no longer has any evidence on either a defect or causation, the Court need not reach Ford's alternative arguments about Wurm's claim for failure to warn. Further, it is unclear what Ford would warn <u>about</u> where no defect or dangerous condition has been shown. The Court notes that Wurm's response largely fails to address <u>any</u> legal argument made by Ford in its motion, and completely fails to point to <u>any</u> evidentiary support for any of his claims. But in response to one factual statement, Wurm suggests that "[f]ailure to warn is a negligence theory that is not a result of strict liability." Doc. 86 at 12. To the extent Wurm is attempting to assert a negligence claim against Ford, that attempt fails because the pretrial order makes clear that his failure-to-warn claim sounds under principles of strict liability. Doc. 66 at 10.

[17] In response to the *Daubert* motion regarding McLellan, Wurm suggests that expert testimony may not even be needed regarding any design defect given "the catastrophic nature of the failure" of the truck's roof." Doc. 85-13 at 2-3. The Court notes that this <u>directly contradicts</u> Wurm's concession in response to the summary-judgment motion that the testimony of McLellan and Parcells is "integral to any possibility of recovery." Doc. 86 at 2. Even if, in response to summary judgment, Wurm was pressing his suggestion that "the catastrophic nature of the failure" of the truck's roof obviated the need for expert testimony, he has failed to come forward with <u>any</u> other evidence that could stand in place of McLellan's or Parcells's testimony. Notably, Wurm cites <u>no evidence</u> in his summary-judgment response, despite purporting to dispute many of Ford's factual statements. This is in plain violation of Rule 56 and District of Kansas Rule 56.1. *See Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010) (stating that a nonmovant "may not rely merely on . . . its own pleadings" and "must come forward with facts supported by competent evidence"). Although he references by incorporation his *Daubert* responses, which did include evidentiary attachments, the Court finds no undisputed evidence among those materials that would obviate

### D. Motion for Sanctions

Finally, Ford has moved for sanctions against Wurm based on his failure to preserve the damaged truck after he knew litigation was imminent. Doc. 74. Ford argues it is entitled to sanctions in the form of dismissal of the case or, in the alternative, judgment on Wurm's claims, an adverse-inference jury instruction, or exclusion of evidence. Doc. 75 at 12. Given the relief sought in the motion for sanctions, the above rulings on Ford's other motions render the motion for sanctions moot, as the Court has already granted the relief sought based on the merits of the other motions. Accordingly. Ford's motion for sanctions is denied without prejudice as moot.

## III. CONCLUSION

THE COURT THEREFORE ORDERS that Ford's Motion to Exclude the Expert Testimony of Shawn Parcells (Doc. 68) and Motion to Exclude the Expert Testimony of David McLellan (Doc. 72) are GRANTED. The testimony of both Parcells and McLellan is EXCLUDED.

THE COURT FURTHER ORDERS that Ford's Motion for Summary Judgment (Doc. 76) is GRANTED. Judgment is to be entered in favor of Ford.

THE COURT FURTHER ORDERS that Ford's Motion to Strike Errata Changes (Doc. 70) is GRANTED. The Court STRIKES the deposition errata changes of Parcells and Kerley.

THE COURT FURTHER ORDERS that Ford's Motion for Sanctions (Doc. 74) is DENIED WITHOUT PREJUDICE as moot.

IT IS SO ORDERED.

Dated: April 1, 2020  /s/  *Holly L. Teeter*
HOLLY L. TEETER
UNITED STATES DISTRICT JUDGE

---

the need for expert testimony regarding the existence of a design defect in the truck or the causation of Wurm's injuries, especially in light of Wurm's admission in response to summary judgment that experts are essential to his case.